IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:10-CV-585-D

MATTHEW J. SZULIK, individually and as )
trustee of the KAITLIN SZULIK TRUST, )
the BRENDAN SZULIK TRUST, and the )
KEENAN SZULIK TRUST, KYLE M. )
SZULIK, and RAYMOND W. SZULIK, )
                                      )
            Plaintiffs,               )
                                      )
      v.                              )       **ORDER**
                                      )
TAG VIRGIN ISLANDS, INC.              )
(formerly Taurus Advisory Group, LLC), )
JAMES S. TAGLIAFERRI, PATRICIA        )
CORNELL, and BARRY B. FEINER,         )
                                      )
            Defendants.               )

On December 23, 2010, Matthew Szulik filed a complaint on behalf of himself and his family

(collectively, "Szuliks" or "plaintiffs") against TAG Virgin Islands, Inc. ("TAG"), James S.

Tagliaferri ("Tagliaferri"), and Patricia Cornell ("Cornell") (collectively, "TAG defendants").

Compl. [D.E. 1]. The complaint also alleged claims against Barry B. Feiner ("Feiner"). Id. On

March 4, 2011, the TAG defendants moved to dismiss for lack of jurisdiction, improper venue, and

failure to state a claim for which relief can be granted [D.E. 20], and filed a supporting memorandum

[D.E. 21]. On March 30, 2011, Feiner filed his own motion to dismiss, asserting lack of personal

jurisdiction, improper venue, and failure to state a claim for which relief can be granted [D.E. 26].

Feiner also submitted a supporting memorandum [D.E. 28]. Both motions to dismiss also contained

motions to strike [D.E. 20, 26]. On April 14, 2011, the Szuliks requested leave to conduct

jurisdictional discovery [D.E. 30]. On April 15, 2011, the court referred that motion to Magistrate

Judge Webb [D.E. 31], who denied it on May 2, 2011 [D.E. 38]. Thereafter, on August 3, 2011, the

Szuliks filed memoranda opposing the motions to dismiss and the motions to strike [D.E. 47–48].

On August 22, 2011, both the TAG defendants and Feiner replied [D.E. 50–51]. On January 12, 2012, the court ordered the parties to submit supplemental filings regarding two specific issues [D.E. 52]. The parties filed their supplemental memoranda on January 19, 2012 [D.E. 53–55]. The next day, Feiner moved to strike portions of the Szuliks' supplemental brief [D.E. 56]. On January 23, 2012, the TAG defendants moved to join Feiner's motion to strike [D.E. 57]. On February 10, 2012, the Szuliks filed a memorandum in opposition to the motion to strike. Pls.' Mem. Opp'n Second Mot. Strike [D.E. 58]. In that memorandum, the Szuliks asked the court to transfer all claims against all defendants to the Southern District of New York. Id. 3–5. On February 13, 2012, Feiner requested leave to file a memorandum opposing transfer to the Southern District of New York [D.E. 59]. On February 22, 2012, the Szuliks sought leave to file a reply to Feiner's memorandum [D.E. 60]. As explained below, the court grants the Szuliks' request to transfer this case to the Southern District of New York.

I.

After first meeting approximately twenty-five years ago, Matthew Szulik and Tagliaferri became close friends. Compl. ¶¶ 18–19. Matthew Szulik and his family also became close friends with Cornell. Id. ¶ 20. Because of these personal relationships, the Szuliks regarded Tagliaferri and Cornell as trusted advisors. Id. ¶ 21. Indeed, the friendships fostered a professional relationship. On March 25, 1996, the Szuliks entered into an Investment Management Agreement ("IMA") with TAG, the company of which Tagliaferri and Cornell were managing directors. Id. ¶ 22; see also Compl., Ex. A ("IMA"). The agreement provided that TAG would "manage the investment of all cash, securities, and other assets comprising the investment portfolio placed under" the company's supervision. IMA ¶ 1. The agreement authorized TAG "without further approval by, or notice to, the [Szuliks], to make all investment decisions concerning the [p]ortfolio and to make purchases, sales, and otherwise effect transactions in stocks, bond[s], and other securities in the [p]ortfolio on behalf of the" Szuliks. Id. So that TAG could "render efficient services," the IMA required the

2

Szuliks to "notify [TAG] of any and all changes in [their] . . . investment objectives . . . ." Id. For TAG's services, the Szuliks paid an annual fee of one percent of the assets under management. Compl. ¶ 23.

TAG representatives first signed the IMA at TAG's Connecticut office. See Pls.' Mem. Opp'n [D.E. 48], Ex. A ("Szulik Aff.") ¶ 7. TAG then mailed the signed IMA to the Szuliks' Raleigh, North Carolina residence, where the Szuliks signed the IMA. Id. ¶¶ 4–7. Only TAG and the Szuliks were party to the IMA. See IMA page 4. Cornell signed the agreement, but only in her representative capacity as one of TAG's managing directors. See id. Connecticut law governs the IMA. Id. ¶ 10.

When signing the IMA, the Szuliks' primary investment objective "was preservation of capital and conservative growth to be achieved primarily through investment in blue-chip stocks and bonds." Compl. ¶ 25. The Szuliks communicated this objective to Tagliaferri and Cornell. Id.

During the life of the IMA, the Szuliks had numerous meetings with Tagliaferri and Cornell. Szulik Aff. ¶ 8. At these meetings, the Szuliks discussed the management of their assets and investments. Id. Although Matthew Szulik and Tagliaferri occasionally met in New York or Connecticut, most of the meetings between the Szuliks and the TAG defendants occurred at the Szuliks' Raleigh, North Carolina home. Id. The Szuliks also communicated with Tagliaferri and Cornell in other ways. For example, Matthew Szulik "exchanged hundreds of emails with Tagliaferri," many of which Matthew Szulik sent from or received in Raleigh, North Carolina. Id. ¶ 9. Matthew Szulik also communicated with Tagliaferri and Cornell by telephone from Raleigh, North Carolina, and Tagliaferri and Cornell sent written correspondence to the Szuliks' Raleigh, North Carolina home. Id.

After operating under the IMA for approximately ten years, relations between the Szuliks and the TAG defendants soured. After mid-2006 and without notice to the Szuliks, TAG liquidated some of the Szuliks' "more conservative investments" and reinvested the proceeds "in suspect, high-

3

risk, illiquid securities, as well as real estate and personal loan instruments . . . ." Compl. ¶ 29. The allegedly inappropriate investments include (1) securities issued by Conversion Services International, Inc. ("Conversion Services"); (2) a loan to Scott Newman, then-CEO of Conversion Services, secured by allegedly worthless Conversion Services equities; (3) corporate bonds, equities, and other assets of International Equine Acquisitions Holdings, Inc. ("IEAH"); (4) a note from Paseo de la Reforma Partners, LLC, secured by a deed of trust on property in Mexico City, Mexico; (5) Protein Polymer Technologies, Inc. ("PPTI") securities; (6) a personal loan to Andrew Cohen; (7) a loan to Peter Neary ("Neary")[1] secured by a mortgage on residential property in Miami Beach, Florida; (8) a personal loan to Marvin Ceder; and, (9) a loan to 1920 Bel Air, LLC ("1920 Bel Air"), secured by a deed of trust on residential property in Los Angeles, California. See id. ¶¶ 32–53. The Szuliks allege that, in exchange for investing in IEAH securities, the TAG defendants took $1,630,000 in illegal kickbacks. Id. ¶¶ 37–38, 54–62.

The Szuliks allege that Feiner, an attorney licensed to practice law in New York, was involved in some of the improper investments and in the kickback scheme. Specifically, Feiner purportedly represented all parties when facilitating an extension of a loan that TAG made to PPTI using the Szuliks' money. Id. ¶¶ 44, 72–73. Feiner also purportedly represented the Szuliks with respect to a stock purchase from Conversion Services, drafted the mortgage documents used in the Neary loan, and "was substituted as trustee with respect to [the] deed of trust" used to secure the 1920 Bel Air investment. Id. ¶¶ 47, 74, 76–77. Finally, Feiner drafted the convertible note agreements and performed other services that allowed the TAG defendants to take kickbacks from IEAH. Id. ¶ 75. The Szuliks, however, have never met with or spoken to Feiner, or engaged him as legal counsel. See id. ¶¶ 72–74, 77; Szulik Aff. ¶¶ 12–13.

---

[1] The Szuliks allege that TAG loaned the money to Wilmslow, LLC, of which Neary was a managing member, but that the loan was really for Neary. Compl. ¶ 47.

Beginning in 2008, Matthew Szulik became "concerned with the . . . composition of [his family's] portfolio . . . ." Compl. ¶ 79. Because occasional statements that he received from Tagliaferri were "incomplete and unintelligible," Matthew Szulik began calling Tagliaferri. Id. Often, Tagliaferri did not answer or return Matthew Szulik's calls. Id. In September 2008, the Szuliks hired a new investment advisor and instructed the TAG defendants to refrain from making new investments without the Szuliks' express consent and to liquidate some existing investments. Id. ¶ 81. After investigation, the Szuliks' new investment advisor concluded that "many of the companies invested in were far too risky [and] illiquid, and the investments did not take into account the Szuliks' short- and long-term needs." Id. ¶ 82. In April 2009, the Szuliks met with Tagliaferri and Cornell at the Szuliks' home. Id. ¶ 84. At that meeting, the Szuliks expressed their concerns about how TAG had invested their funds. Id. "The TAG Defendants offered no explanation [for their conduct] and subsequently failed to return phone calls or provide requested information." Id. In July 2009, the Szuliks terminated the IMA. Id. ¶ 85. In February 2010, the Szuliks received copies of invoices from one of the TAG defendants' former attorneys. Id. ¶ 89. Those invoices showed kickbacks TAG had received from IEAH. Id.

The Szuliks assert ten claims against the TAG defendants, three claims against Feiner, and a civil conspiracy claim against all defendants. See generally id. ¶¶ 90–173.[2] Both the TAG defendants and Feiner have moved to dismiss all claims. TAG Defs.' Mot. Dismiss [D.E. 20]; Feiner's Mot. Dismiss [D.E. 26]. The TAG defendants and Feiner ask the court to dismiss the claims, inter alia, for lack of personal jurisdiction and for improper venue. TAG Defs.' Mot.

---

[2] Plaintiffs assert the following claims against the TAG defendants: (1) constructive fraud/breach of fiduciary duty; (2) request for an accounting; (3) violation of SEC Rule 10b-5; (4) violation of the Investment Advisers Act of 1940; (5) violation of the North Carolina Investment Advisers Act; (6) fraud; (7) negligence; (8) negligent misrepresentation; (9) breach of the implied covenant of good faith and fair dealing; (10) breach of contract; and, (11) conspiracy. See Compl. ¶¶ 90–152, 165–69. Plaintiffs assert the following claims against Feiner: (1) legal malpractice; (2) aiding and abetting a breach of fiduciary duty; (3) conspiracy; and, (4) fraud. See id. ¶¶ 153–73.

Dismiss; Feiner's Mot. Dismiss; see also TAG Defs.' Mem. Supp. Mot. Dismiss [D.E. 21] 6–14; Feiner's Mem. Supp. Mot. Dismiss [D.E. 28] 3–9. The TAG defendants also move to transfer the case to the District of Connecticut, whereas Feiner moves for outright dismissal. See TAG Defs.' Mot. Dismiss; Feiner's Mot. Dismiss; TAG Defs.' Mem. Supp. Mot. Dismiss 14–17; Feiner's Mem. Supp. Mot. Dismiss 8–9. In opposition, the Szuliks maintain that this court has personal jurisdiction over all defendants and that the Eastern District of North Carolina is a proper venue as to all defendants. Pls.' Mem. Opp'n [D.E. 48] 9–19. Alternatively, the Szuliks initially requested that, rather than dismiss the complaint as to the TAG defendants for improper venue, "this case be transferred to the District of Connecticut in the interests of justice . . . or that [the Szuliks] be given an opportunity to amend their complaint to address any deficiencies." Id. 19 n.9. The Szuliks did not, however, address the possibility that the court could dismiss the complaint against Feiner for lack of personal jurisdiction or for improper venue. In its January 12, 2012 order, the court directed the parties to address these possibilities.

On January 19, 2012, the parties responded. The Szuliks requested that, in lieu of dismissal, the court sever the claims against Feiner and transfer those claims to the Southern District of New York. See Pls.' Suppl. Mem. [D.E. 53] 4–7. The Szuliks requested that the claims against the TAG defendants remain in the Eastern District of North Carolina. See id. The TAG defendants conceded personal jurisdiction and venue in the Southern District of New York and requested that, if the court transferred venue, the court transfer the case to either the Southern District of New York or the District of Connecticut. TAG Defs.' Suppl. Mem. [D.E. 54] 1–4. Feiner asked that the court not transfer venue, but instead dismiss the Szuliks' claims against him. Feiner's Suppl. Mem. [D.E. 55] 1–6. Once the TAG defendants conceded personal jurisdiction in the Southern District of New York, the Szuliks asked the court to transfer the entire case to that district. Pls.' Mem. Opp'n Second Mot. Strike 3–5.

The court addresses only the motions to dismiss for lack of personal jurisdiction and for

6

improper venue, and the motions to transfer venue to the Southern District of New York.[3] In doing

so, the court first analyzes whether it can exercise personal jurisdiction over the TAG defendants and

over Feiner, and whether the Eastern District of North Carolina is a proper venue as to the TAG

defendants and as to Feiner. The court then assesses whether it should transfer venue to the Southern

District of New York.

## II.

### A.

Federal Rule of Civil Procedure 12(b)(2) allows a defendant to move to dismiss a complaint

for lack of personal jurisdiction. See Fed. R. Civ. P. 12(b)(2). To defeat a Rule 12(b)(2) motion,

a plaintiff typically must prove by a preponderance of the evidence that the court can exercise

personal jurisdiction. See Combs v. Baker, 886 F.2d 673, 676 (4th Cir. 1989). But when the court

rules on the motion without an evidentiary hearing, the plaintiff need only establish a prima facie

case. Id. When determining whether the plaintiff has met this burden, courts resolve all factual

disputes and draw all reasonable inferences in the light most favorable to the plaintiff. Id.; see Mylan

Labs., Inc. v. Akzo, N.V., 2 F.3d 56, 60 (4th Cir. 1993). Here, the court is deciding the defendants'

Rule 12(b)(2) motions without conducting an evidentiary hearing. Thus, the Szuliks need only

present a prima facie case of personal jurisdiction.

The TAG defendants and Feiner have both moved to dismiss for lack of personal jurisdiction.

The court addresses each motion separately.

### 1.

The TAG defendants contend that the court lacks personal jurisdiction over them, whether

---

[3] Although neither the Szuliks nor the TAG defendants have formally moved to transfer
venue to the Southern District of New York, the court interprets their requests to transfer venue to
the Southern District of New York as formal motions for such transfer. See Dee-K Enters., Inc. v.
Heveafil Sdn. Bhd., 985 F. Supp. 640, 645 n.15 (E.D. Va. 1997); TAG Defs.' Suppl. Mem. 1–3; Pls.'
Mem. Opp'n Second Mot. Strike 3–5.

that jurisdiction is pursuant to section 78aa ("section 78aa") of the Securities Exchange Act of 1934 ("1934 Act") or the North Carolina long-arm statute. TAG Defs.' Mem. Supp. Mot. Dismiss 6–13; TAG Defs.' Reply [D.E. 51] 1–6.

Section 78aa provides a basis for a court's exercising personal jurisdiction over a defendant. See 15 U.S.C. § 78aa(a). However, before doing so, a court must ensure that the complaint alleges a valid 1934 Act claim. For example, a court must ensure that the plaintiff's claims are not time-barred. Pursuant to the Sarbanes-Oxley Act, a plaintiff must bring 1934 Act claims within "2 years after the discovery of the facts constituting the violation," or within "5 years after such violation," whichever is earlier. 28 U.S.C. § 1658(b).

Here, the Szuliks raise two claims under the 1934 Act: (1) a violation of the Act's section 10(b) ("section 10(b)"), 15 U.S.C. § 78j, and, (2) a violation of the corresponding Securities Exchange Commission ("SEC") Rule 10b-5 ("Rule 10b-5"), 17 C.F.R. § 240.10b-5. The Szuliks base these claims on the TAG defendants' failure to disclose the kickback arrangement between the TAG defendants and IEAH. See Compl. ¶¶ 103–12; Pls.' Mem. Opp'n 30–31. Whether the alleged violations occurred within five years of the Szuliks' filing the complaint is not in issue. The parties agreed to toll any statute of limitations that had not expired before July 1, 2010. See TAG Defs.' Reply 4 n.4. That agreement encompassed the five-year statute of limitations for the Szuliks' 1934 Act claims. The parties instead dispute whether the Szuliks discovered the facts giving rise to the alleged violations more than two years before filing suit. See TAG Defs.' Mem. Supp. Mot. Dismiss 26–28; Pls.' Mem. Opp'n 29–32.

The Supreme Court addressed the two-year statute of limitations in Merck & Co., Inc. v. Reynolds, 130 S. Ct. 1784 (2010). The Court held that the two-year limit does not begin to run until either the plaintiff actually discovered or a reasonably diligent plaintiff would have discovered the facts—including "the fact of scienter"—constituting the securities law violation. Id. at 1789–90. Expounding on the "reasonably diligent plaintiff," the Supreme Court expressly rejected inquiry

8

notice as the relevant standard. Id. at 1797–98.[4]  A defendant must do more than merely show that the plaintiff "possesse[d] a quantum of information sufficiently suggestive of wrongdoing that he should conduct a further inquiry." Id. at 1797 (quotation omitted).

The TAG defendants contend that the two-year statute of limitations on the Szuliks' section 10(b) and Rule 10b-5 claims began to run no later than mid-2008. TAG Defs.' Mem. Supp. Mot. Dismiss 27–28. The TAG defendants first assert that the Szuliks knew of the fraud more than two years before they sued. Id. In support, the TAG defendants cite a statement from the Szuliks' complaint alleging that "Matthew Szulik learned of [the TAG defendants'] use of his funds [to invest in 1920 Bel Air] when he was served with a complaint issued out of the Bankruptcy Court for the District of Nevada in or around February 2007." Id. 27 (quotation omitted, emphasis removed); see Compl. ¶ 53. The TAG defendants also cite a statement from the Szuliks' memorandum in opposition to the motions to dismiss, which states that the TAG defendants began making "risky, fraudulent, and unsuitable investments" in mid-2006. TAG Defs.' Reply 4 (quotation omitted, emphasis removed); see Pls.' Mem. Opp'n 1.[5]  Neither statement supports the TAG defendants' argument. In fact, the TAG defendants' focus on whether the Szuliks should have known that TAG

_____

[4] Oddly, the TAG defendants appear to rely on inquiry notice as a basis for their motion to dismiss. TAG Defs.' Mem. Supp. Mot. Dismiss 27. The TAG defendants cite Merck, noting that it "clarifie[s]" when section 10(b)'s two-year statute of limitations begins to run. Id. 26; see also TAG Defs.' Reply 4–5. But they then ignore the Court's holding and cite legal propositions expressly disavowed in Merck. See TAG Defs.' Mem. Supp. Mot. Dismiss 26. The TAG defendants' block quotation from Merck is particularly troubling. See id. The quotation provides the first two sentences of a three-sentence paragraph comprising the core of the Court's holding; the omitted third sentence was the Court's actual holding. See Merck, 130 S. Ct. at 1798. That the TAG defendants failed to acknowledge the precedential import of that sentence suggests—most charitably—a fundamental misunderstanding of Merck.

[5] Based on this quotation alone, the TAG defendants argue that the statute of limitations began running "prior to December 2007." TAG Defs.' Reply 4. The TAG defendants, however, rip the quotation from its context. The allegation in the quotation was based on the Szuliks' pre-litigation investigation and does not indicate facts actually known to the Szuliks in mid-2006. See Compl. ¶¶ 78–89; Pls.' Mem. Opp'n 1, 4–7. Accordingly, the statement does not help the TAG defendants.

9

was investing the Szuliks' money in contravention of their wishes betrays a basic misunderstanding of the Szuliks' section 10(b) and Rule 10b-5 claims. Compare Compl. ¶¶ 102–12, with TAG Defs.' Mem. Supp. Mot. Dismiss 26–28, and TAG Defs.' Reply 3–5. The Szuliks premise the alleged section 10(b) and Rule 10b-5 violations on the TAG defendants' kickback arrangement with IEAH and their subsequent failure to disclose that arrangement. See Compl. ¶¶ 102–12. Neither statement that the TAG defendants cite concerns the IEAH kickback arrangement, and thus neither is relevant to the court's inquiry. The TAG defendants simply have not shown that the Szuliks discovered the alleged fraud more than two years before filing the complaint.

Alternatively, the TAG defendants argue that a reasonably diligent person would have discovered the fraud more than two years before the Szuliks sued. TAG Defs.' Reply 4–5. Supporting this contention, the TAG defendants rely on two pieces of evidence. First, in December 2007, Matthew Szulik began reviewing statements from TAG that listed the allegedly improper investments. Id. 4. Those statements, the TAG defendants contend, would have shown a reasonably diligent person that TAG was not investing the Szuliks' funds in blue-chip securities. Id. Second, the Szuliks read a May 29, 2008 New York Times article "detailing certain facts" about IEAH's CEO, Michael Iavarone ("Iavarone"). TAG Defs.' Mem. Supp. Mot. Dismiss 27. Specifically, the article detailed securities fraud perpetrated by one of Iavarone's former employers, and disclosed that the National Association of Securities Dealers had fined Iavarone and suspended him from selling securities. See Compl. ¶¶ 55–57; Compl., Ex. C ("May 29, 2008 New York Times article"); TAG Defs.' Mem. Supp. Mot. Dismiss 27. Based on these facts, the TAG defendants argue that a reasonably diligent person would have discovered the TAG defendants' alleged fraud no later than mid-2008. TAG Defs.' Mem. Supp. Mot. Dismiss 27; TAG Defs.' Reply 4–5. The TAG defendants' evidence, however, is unpersuasive. Again, the Szuliks' section 10(b) and Rule 10b-5 claims are predicated on the TAG defendants' kickback arrangement with IEAH. Whether the Szuliks knew or should have known about other improper investments is irrelevant. The TAG

10

defendants therefore have not demonstrated that a reasonably diligent plaintiff would have discovered the alleged section 10(b) and Rule 10b-5 violations more than two years before the Szuliks filed suit.

A review of the pleadings confirms these conclusions. None of the facts in the complaint or in the parties' memoranda suggest that the Szuliks knew, or that a reasonably diligent plaintiff would have known, about the IEAH kickback scheme before the Szuliks received incriminating statements in February 2010. When the Szuliks first became concerned with their portfolio, they placed several telephone calls to TAG and met with both Tagliaferri and Cornell. See Compl. ¶¶ 79–88. But TAG employees rebuffed the Szuliks at every turn. See id. Stifled in their investigations, the Szuliks hired a new investment advisor in September 2008. Id. ¶ 81. That new advisor further investigated the Szuliks' portfolio. Id. ¶ 82. She discovered that "many of the companies invested in were far too risky [and] illiquid, and [that] the investments did not take into account the Szuliks' short- and long-term needs." Id. She did not, however, discover that TAG had entered into a kickback arrangement with IEAH. See id. In April 2009, and with growing concerns, the Szuliks met with Tagliaferri and Cornell at the Szuliks' Raleigh, North Carolina home. Id. ¶ 84. At that meeting, the Szuliks asked about TAG's use of the Szuliks' funds and "raised concerns with certain individuals associated with several of these investments . . . ." Id. Tagliaferri and Cornell "offered no explanation and subsequently failed to return phone calls or provide requested information." Id. The Szuliks, in short, were unable to uncover the facts constituting the alleged violations until February 2010, when the Szuliks received statements revealing the TAG defendants' kickback arrangement. See id. ¶ 89. Accordingly, the two-year statute of limitations began to run no earlier than February 2010. Because the Szuliks filed their complaint on December 23, 2010, the Szuliks' section 10(b) and Rule 10b-5 claims are timely.

Having determined that the Szuliks' section 10(b) and Rule 10b-5 claims are timely, the court next addresses whether it has personal jurisdiction over the TAG defendants pursuant to section

11

78aa. The 1934 Act permits service of process "in any . . . district of which the defendant is an inhabitant or wherever the defendant may be found." 15 U.S.C. § 78aa(a). This nationwide service-of-process provision grants district courts nationwide personal jurisdiction. When "Congress has authorized nationwide service of process by federal courts under specific federal statutes, so long as the assertion of jurisdiction over the defendant is compatible with due process, the service of process is sufficient to establish the jurisdiction of the federal court over the person of the defendant." Hogue v. Milodon Eng'g, Inc., 736 F.2d 989, 991 (4th Cir. 1984).

Section 78aa confers on federal district courts personal jurisdiction over any defendant that has minimum contacts with the United States. E.g., Busch v. Buchman, Buchman & O'Brien, Law Firm, 11 F.3d 1255, 1258 (5th Cir. 1994); United Liberty Life Ins. Co. v. Ryan, 985 F.2d 1320, 1330 (6th Cir. 1993); Sec. Investor Prot. Corp. v. Vigman, 764 F.2d 1309, 1315–16 (9th Cir. 1985); Fitzsimmons v. Barton, 589 F.2d 330, 332–34 (7th Cir. 1979); Mariash v. Morrill, 496 F.2d 1138, 1142–43 (2d Cir. 1974); First Fin. Sav. Bank, Inc. v. Am. Bankers Ins. Co. of Fla., Inc. (In re Conner Bonds Litig.), No. 88-33-CIV-5, 1988 WL 110054, at *14 (E.D.N.C. July 21, 1988) (unpublished); accord ESAB Grp., Inc. v. Centricut, Inc., 126 F.3d 617, 626–27 (4th Cir. 1997) (interpreting a similarly worded nationwide service-of-process provision—18 U.S.C. § 1965(d)—as granting nationwide personal jurisdiction over any defendant that has minimum contacts with the United States). Exercising such personal jurisdiction comports with the Due Process Clause of the Fifth Amendment, regardless of a defendant's contacts with a specific forum state. See, e.g., Busch, 11 F.3d at 1258; United Liberty, 985 F.2d at 1330; Vigman, 764 F.2d at 1315–16; Fitzsimmons, 589 F.2d at 332–34; Mariash, 496 F.2d at 1142–43; accord Med. Mut. of Ohio v. deSoto, 245 F.3d 561, 566–68 (6th Cir. 2001); ESAB Grp., 126 F.3d at 626–27. If a defendant is located in the United States, that defendant will almost always have minimum contacts with the United States sufficient to allow a federal court to exercise personal jurisdiction. See, e.g., Busch, 11 F.3d at 1257–58; United Liberty, 985 F.2d at 1330; Vigman, 764 F.2d at 1315–16; Fitzsimmons, 589 F.2d at 332–34;

12

Mariash, 496 F.2d at 1143; accord deSoto, 245 F.3d at 568; ESAB Grp., 126 F.3d at 627. "[W]hen the defendant is located within the United States, he must look primarily to federal venue requirements for protection from onerous litigation, because it is only in highly unusual cases that inconvenience will rise to a level of constitutional concern . . . ." ESAB Grp., 126 F.3d at 627 (quotation and citations omitted).

Here, TAG, Tagliaferri, and Cornell are all located in the United States. TAG was formerly a Connecticut corporation, TAG Defs.' Mem. Supp. Mot. Dismiss 11, and is currently "organized under the laws of the United States Virgin Islands with its principal place of business . . . [in] St. Thomas, [United States Virgin Islands]." Compl. ¶ 12. Tagliaferri's principal residence is either in Connecticut or in the United States Virgin Islands, and Cornell's principal residence is in Connecticut. Id. ¶¶ 13–14. Furthermore, each defendant has transacted significant business in the United States. See, e.g., id. ¶¶ 3–5, 22–62, 67–68, 70, 84–89; TAG Defs.' Mem. Supp. Mot. Dismiss 3–5, 9–12. The TAG defendants' minimum contacts with the United States are sufficient to allow this court to exercise personal jurisdiction over them. Accordingly, the court has personal jurisdiction over TAG, Tagliaferri, and Cornell pursuant to section 78aa. In light of this conclusion, the court need not address whether the North Carolina long-arm statute reaches the TAG defendants.

2.

As for Feiner, the Szuliks do not allege that Feiner violated any securities law. See Compl. ¶¶ 153–73; accord Pls.' Mem. Opp'n 9–11 (arguing that section 78aa confers personal jurisdiction over the TAG defendants only). Thus, section 78aa does not confer personal jurisdiction over Feiner. Rather, the Szuliks must demonstrate that North Carolina's long-arm statute, in accordance with the Due Process Clause, confers on this court personal jurisdiction over Feiner. Cf. Pls.' Mem. Opp'n 11–17.

The North Carolina long-arm statute extends personal jurisdiction over out-of-state defendants in all cases in which the Due Process Clause permits. See Dillon v. Numismatic Funding

13

Corp., 291 N.C. 674, 676, 231 S.E.2d 629, 630–31 (1977); Century Data Sys., Inc. v. McDonald, 109 N.C. App. 425, 427, 428 S.E.2d 190, 191 (1993).  To determine whether the North Carolina long-arm statute reaches a particular defendant, courts analyze whether the defendant has sufficient minimum contacts with North Carolina such that "maintenance of the suit does not offend traditional notions of fair play and substantial justice."  Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945) (quotation omitted); see Dillon, 291 N.C. at 676–80, 231 S.E.2d at 630–33.

Courts recognize two types of personal jurisdiction:  general and specific.  See Goodyear Dunlop Tires Operations, S.A. v. Brown, 131 S. Ct. 2846, 2851 (2011).  Here, the Szuliks allege only that the court has specific jurisdiction over Feiner.  See Pls.' Mem. Opp'n 11–17.[6]

When assessing specific personal jurisdiction, courts consider three factors:  "(1) the extent to which the defendant has purposefully availed itself of the privilege of conducting activities in the [forum] state; (2) whether the plaintiffs' claims arise out of those activities directed at the state; and (3) whether the exercise of personal jurisdiction would be constitutionally 'reasonable.'"  Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc., 334 F.3d 390, 397 (4th Cir. 2003); see Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474–77 (1985).  When analyzing the first two elements, courts consider only the defendant's activities.  See Burger King, 471 U.S. at 472–78.  In keeping with this principle, a plurality of the Supreme Court has held that "[t]he substantial connection between the defendant and the forum State necessary for a finding of minimum contacts must come about by an action of the defendant purposefully directed toward the forum State."  Asahi Metal Indus. Co., Ltd. v. Super. Ct. of Cal., 480 U.S. 102, 112 (1987) (plurality opinion) (citations omitted, emphasis removed).

---

[6] A court may exercise general personal jurisdiction over a defendant if the defendant has "continuous and systematic contacts" with the forum state.  See Brown, 131 S. Ct. at 2853–57 (quotation omitted).  Feiner's uncontested declaration makes clear that his contacts with North Carolina are neither continuous nor systematic.  Feiner's Mot. Dismiss, Att. 1 ("Feiner Decl.") ¶¶ 4–9.  Accordingly, this court may not exercise general personal jurisdiction over Feiner.  See Brown, 131 S. Ct. at 2853–57.

Feiner has not purposefully availed himself of the privilege of conducting activities in North Carolina. Feiner does not and has not resided in North Carolina. Feiner Decl. ¶¶ 4–5. Feiner is admitted to practice law in New York only. Id. ¶ 4. He has not, does not, and cannot practice law in North Carolina. See id. ¶¶ 4, 6. He has never been a member of a law firm having a North Carolina office and does not have any other business or property interests in the state. Id. Additionally, Feiner has never met or communicated with the Szuliks, never given investment or legal advice to the Szuliks, and, until this litigation, never sent to North Carolina any documents or communications concerning the matters alleged. Id. ¶¶ 7–9. Feiner simply has not conducted any activities in North Carolina, and therefore has not purposefully availed himself of the privilege of doing so.

Nor do the Szuliks' claims against Feiner arise from Feiner's contacts with North Carolina. Although the TAG defendants engaged in investment activities in North Carolina, and although Feiner may have drafted documents and otherwise assisted the TAG defendants in those investment activities, Feiner performed all of his work outside North Carolina. See id. ¶¶ 4, 6–9. The activities that occurred in North Carolina resulted exclusively from the TAG defendants' actions. As such, the TAG defendants' North Carolina investment activities do not provide a basis for exercising specific personal jurisdiction over Feiner. See World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980). Moreover, only Feiner's actions are relevant to the court's analysis. See Asahi Metal, 480 U.S. at 108–12; Burger King, 471 U.S. at 472–78.

In light of the record, exercising specific personal jurisdiction over Feiner would violate the Due Process Clause. See Lolavar v. de Santibanes, 430 F.3d 221, 226–27 (4th Cir. 2005); Allison v. Lomas, 387 F. Supp. 2d 516, 521 (M.D.N.C. 2005). Thus, the North Carolina long-arm statute does not reach Feiner, and the court lacks personal jurisdiction over him.

In opposition to this conclusion, the Szuliks make two arguments. First, they contend that Feiner conspired with the TAG defendants to defraud the Szuliks, and that "a conspiracy theory can

15

provide the means of showing sufficient contacts with a particular forum to authorize in personam jurisdiction." Pls.' Mem. Opp'n 16. Second, the Szuliks contend that the "effects test" allows the court to exercise personal jurisdiction over Feiner. Id. 16–17.

As for the Szuliks' conspiracy theory, the Fourth Circuit has "approved the exercise of long-arm jurisdiction pursuant to [a] conspiracy theory . . . ." McLaughlin v. McPhail, 707 F.2d 800, 807 (4th Cir. 1983) (per curiam); see also Lolavar, 430 F.3d at 229. However, a plaintiff must "make a threshold showing, inter alia, that a conspiracy existed and that the defendants participated therein." McLaughlin, 707 F.2d at 807. Mere allegations of a conspiracy will not suffice. See Lolavar, 430 F.3d at 229. A civil conspiracy requires proof that (1) two or more persons agreed to commit an unlawful act, (2) a member of the conspiracy committed an overt act in furtherance of the agreement, and, (3) the overt act injured the plaintiff. See Gutierrez v. Mass. Bay Transp. Auth., 437 Mass. 396, 415, 772 N.E.2d 552, 568 (2002); see also Macomber v. Travelers Prop. & Cas. Corp., 277 Conn. 617, 635–36, 894 A.2d 240, 254–55 (2006); Muse v. Morrison, 234 N.C. 195, 198, 66 S.E.2d 783, 784–85 (1951).[7]

The Szuliks have not alleged sufficient facts to show that a civil conspiracy involving Feiner existed. See, e.g., Bin Xu v. Univ. of N.C. at Charlotte, No. 3:08CV403-RLV, 2010 WL 5067423, at *6 (W.D.N.C. Dec. 6, 2010) (unpublished); Chabad Lubavitch of Litchfield Cnty., Inc. v. Borough of Litchfield, No. 3:09-CV-1419 (JCH), 2010 WL 2977125, at *2–3 (D. Conn. July 21, 2010); Marchand v. Town of Hamilton, Civil Action No. 09-10433-LTS, 2009 WL 3246607, at *2, 8 (D. Mass. Oct. 5, 2009); Barnett v. Carberry, Civil No. 3:08cv714 (AVC), 2009 WL 902396, at *11–12 (D. Conn. Mar. 30, 2009), aff'd, 420 F. App'x 67 (2d Cir. 2011) (unpublished). Accordingly, this

---

[7] The court assumes, without deciding, that Massachusetts law governs all tort-based claims in this case. See generally Harco Nat'l Ins. Co. v. Grant Thornton LLP, 698 S.E.2d 719 (N.C. App. 2010), cert. denied, 706 S.E.2d 235 (2011). However, the facts alleged in the Szuliks' complaint also fail to support the existence of a civil conspiracy involving Feiner under North Carolina or Connecticut law.

conspiracy-based theory of jurisdiction fails.

As for the Szuliks' effects argument, when a defendant commits intentional, harmful acts against a plaintiff, and when those acts are expressly aimed at the plaintiff's state of residence, that state can exercise personal jurisdiction over the defendant. See Calder v. Jones, 465 U.S. 783, 788–90 (1984). That the defendant otherwise lacks contacts with the forum state is of no moment. Id. "Calder thus stands for the proposition that a court may exercise personal jurisdiction over a non-resident defendant who acts intentionally to cause harm to a resident's legally protected interest, knowing that such conduct will cause harm at the victim's domicile to personal or property interests located there." Musselwhite v. Int'l Learning Works, Inc., No. 2:97CV460, 1997 WL 34588522, at *3 (M.D.N.C. Oct. 17, 1997) (unpublished). However, the effects test requires a defendant to expressly aim his actions at the forum state. See Calder, 465 U.S. at 789; see Fiore v. Walden, 657 F.3d 838, 849–53 (9th Cir. 2011); cf. ESAB Grp., 126 F.3d at 625.

The Szuliks do not allege sufficient facts suggesting that Feiner expressly aimed any action at North Carolina. Therefore, the effects test does not permit this court to exercise personal jurisdiction over Feiner.

## B.

The TAG defendants and Feiner also have moved to dismiss the Szuliks' complaint under Federal Rule of Civil Procedure 12(b)(3) for improper venue. When subject matter jurisdiction is based on both diversity of citizenship and the presence of a federal question—as is the case here, see Compl. ¶ 16—venue is proper in

> (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, . . . or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.

28 U.S.C. § 1391(b).[8] The Szuliks contend that the Eastern District of North Carolina is a proper venue under section 1391(b)(2). Compl. ¶ 17.

Under section 1391(b)(2), venue may be proper in more than one jurisdiction. See Mitrano v. Hawes, 377 F.3d 402, 405 (4th Cir. 2004). The relevant inquiry is whether substantial activities occurred in the forum district such that venue is proper there. Id. "[T]hat substantial activities took place in district B does not disqualify district A as [a] proper venue as long as 'substantial' activities took place in A, too." Hardee's Food Sys., Inc. v. Beardmore, 169 F.R.D. 311, 316 (E.D.N.C. 1996) (quotation omitted). In fact, "district A should not be disqualified even if it is shown that the activities in B were more substantial, or even the most substantial." Id. (quotation omitted). When assessing whether substantial activities occurred in the forum district, courts focus on "the entire sequence of events underlying the claim." Mitrano, 377 F.3d at 405 (quotation omitted).

As for the TAG defendants, venue is proper in the Eastern District of North Carolina. The Szuliks signed the IMA in this district.[9] The Szuliks were the last party to sign the contract. See [D.E. 30], Att. 4 ("Partially Executed IMA") & Att. 5 ("Fully Executed IMA"); Szulik Aff. ¶¶ 5–7. Thereafter, the TAG defendants communicated and met with the Szuliks in this district. Compl. ¶¶ 24, 78–79, 83–85; Szulik Aff. ¶¶ 8–10. In some of these communications and meetings, the TAG defendants allegedly omitted or misstated information, giving rise to at least some of the Szuliks' claims. See, e.g., Compl. ¶¶ 96–130, 136–41. Thus, substantial acts and omissions giving rise to

---

[8] On December 7, 2011, Congress amended section 1391(b). See Federal Courts Jurisdiction and Venue Clarification Act of 2011, Pub. L. No. 112-63, § 202, 125 Stat. 758, 763 (2011). The amended language does not appear to apply retroactively to pending cases, and therefore is not used in this order. See id. § 205, 125 Stat. at 764–65; Denver & Rio Grande W. R.R. Co. v. Bhd. of R.R. Trainmen, 387 U.S. 556, 563 (1967). But the court need not, and does not, resolve the question of retroactivity because the amended language of section 1391(b) is substantively identical to the text that it replaced. Compare 28 U.S.C. § 1391(b), with 28 U.S.C. § 1391(b) (2006) (amended 2011).

[9] The parties dispute where the Szuliks signed the IMA. Compare Pls.' Mem. Opp'n 13 n.3, with TAG Defs.' Mem. Supp. Mot. Dismiss 11. At this stage of the proceedings, the court must draw all reasonable inferences in the Szuliks' favor. Thus, the court finds (for purposes of this order) that the Szuliks signed the IMA in Raleigh, North Carolina.

the Szuliks' complaint occurred in the Eastern District of North Carolina, making this district a proper venue as to the TAG defendants.

As for Feiner, venue is not proper in the Eastern District of North Carolina. Feiner has never visited this district to meet with the Szuliks. Feiner Decl. ¶ 7; Szulik Aff. ¶ 12. Before this dispute, Feiner had never sent to or received from North Carolina any communications relevant to the matters alleged. Feiner Decl. ¶ 7. Likewise, Feiner has not given the Szuliks any investment or legal advice, and the Szuliks have never retained him as their attorney. Id. ¶¶ 8–9. To the extent that Feiner worked for the TAG defendants, Feiner performed his work in New York or Connecticut. See id. ¶¶ 4, 6–9; Szulik Aff. ¶¶ 12–13. Indeed, all of the claims brought against Feiner arise from his actions performed outside the Eastern District of North Carolina. See Compl. ¶¶ 153–73. As to Feiner, the Eastern District of North Carolina is not a proper venue.

### III.

Having determined that personal jurisdiction exists and that venue is proper in the Eastern District of North Carolina as to the TAG defendants only, the court now considers whether to dismiss the claims against Feiner, sever and transfer the claims against Feiner, or transfer the entire case.

### A.

When venue is improper in the district where a case was filed, a district court may "dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." 28 U.S.C. § 1406(a). The statute thus establishes a two-part inquiry. The court first must determine whether the case could have been brought in another district. If so, the court must determine whether the interest of justice warrants a transfer of venue to that other district. See Convergence Techs. (USA), LLC v. Microloops Corp., 711 F. Supp. 2d 626, 640–41 (E.D. Va. 2010).

The Szuliks could have brought their claims against Feiner in the Southern District of New

York. Feiner lives in Harrison, New York, which is located in Westchester County, part of the Southern District of New York. See 28 U.S.C. § 112(b); Feiner Decl. ¶ 4. Had the Szuliks originally sued Feiner in that district, venue would have been proper under 28 U.S.C. § 1391(b)(1). The district court also would have had personal jurisdiction over Feiner. See N.Y.C.P.L.R. § 301; Int'l Shoe, 326 U.S. at 316. The issue then becomes whether this court should, in the interest of justice, transfer the claims against Feiner to the Southern District of New York.

Section 1406(a) provides an equitable tool intended to "remov[e] whatever obstacles may impede an expeditious and orderly adjudication of cases and controversies on their merits." Goldlawr, Inc. v. Heiman, 369 U.S. 463, 466–67 (1962). A court should interpret section 1406(a) broadly to effectuate its broad remedial purpose. See id.; Porter v. Groat, 840 F.2d 255, 257–58 (4th Cir. 1988). Indeed, the Fourth Circuit has held that section "1406(a) . . . authorizes the transfer of a case to any district, which would have had venue if the case were originally brought there, for any reason which constitutes an impediment to a decision on the merits in the transferor district but would not be an impediment in the transferee district." Porter, 840 F.2d at 258. The decision to transfer venue pursuant to section 1406(a) rests within the sound discretion of the district court. See Nichols v. G.D. Searle & Co., 991 F.2d 1195, 1201 (4th Cir. 1993); Staley v. Homeland, Inc., 368 F. Supp. 1344, 1348 (E.D.N.C. 1974).

Exercising that discretion, the court finds that the Eastern District of North Carolina is an improper venue as to Feiner, and that the court lacks personal jurisdiction over him. Both procedural deficiencies are "impediment[s] to a decision on the merits in the transferor district . . . ." Porter, 840 F.2d at 258; see also id. at 257–58 (collecting cases); accord 28 U.S.C. § 1406(a); Goldlawr, 369 U.S. at 466–67; Carefirst of Md., Inc. v. Carefirst Urgent Care Ctr., LLC (In re Carefirst of Md., Inc.), 305 F.3d 253, 255–56 (4th Cir. 2002); Jenkins v. Albuquerque Lonestar Freightliner, LLC, 464 F. Supp. 2d 491, 494 (E.D.N.C. 2006); Regent Lighting Corp. v. Am. Lighting Concept, Inc., 25 F. Supp. 2d 705, 713 (M.D.N.C. 1997). As they relate to Feiner, then, both prerequisites to a transfer

20

of venue under section 1406 are met. Accordingly, the court may transfer the Szuliks' claims against Feiner to the Southern District of New York.

Opposing this conclusion, Feiner argues that the Szuliks "knew that there were no facts justifying asserting jurisdiction over the [d]efendants' persons or laying venue in North Carolina." Feiner's Suppl. Mem. 6. Instead, the Szuliks, "in bad faith, brought the action in a [d]istrict to harass the [d]efendants with litigation in a remote forum." Id. According to Feiner, the Szuliks' obvious mistakes regarding personal jurisdiction and venue warrant dismissal rather than transfer. See id. 3–6.

Feiner's argument fails. District courts may deny a section 1406 motion to transfer and instead dismiss a defendant outright when "the plaintiff's attorney could reasonably have foreseen that the forum in which he/she filed was improper." Nichols, 991 F.2d at 1201 (collecting cases). But that is not this case. As discussed, the court has personal jurisdiction over the TAG defendants and venue in this district is proper as to them. When the Szuliks filed their complaint, they believed that Feiner was an integral part of a larger conspiracy involving the TAG defendants and a scheme to defraud the Szuliks. See, e.g., Compl. ¶¶ 4, 7, 30, 47, 53, 62, 72–77, 153–73; Pls.' Mem. Opp'n 5, 7, 16, 34–43. Indeed, the Szuliks alleged that Feiner was instrumental in executing the TAG defendants' kickback scheme with IEAH and that Feiner represented both the Szuliks and the TAG defendants when negotiating securities and loan transactions that violated the IMA. Compl. ¶¶ 4, 47, 53, 62, 72–77, 153–73. Furthermore, the Szuliks believed that the economic effects of Feiner's alleged wrongdoing occurred in the Eastern District of North Carolina, where the Szuliks reside. Pls.' Mem. Opp'n 16–17. Based on those beliefs, the Szuliks raised credible, albeit unavailing, arguments about personal jurisdiction and venue. See id. 16–18; Pls.' Suppl. Mem. 2–4; Pls.' Mem. Opp'n Second Mot. Strike 3. That the court ultimately rejected those arguments is of no moment. The Szuliks' beliefs concerning Feiner were reasonable, and their conduct was far short of the "obvious error[s]" that might justify dismissal. Nichols, 991 F.2d at 1201; see Estate of Bank v.

21

Swiss Valley Farms, Co., 286 F. Supp. 2d 514, 515–16, 521–22 (D. Md. 2003); Dee-K Enters., 985 F. Supp. at 645–46.

Even if the Szuliks did make obvious errors regarding personal jurisdiction and venue as to Feiner, such errors would not obligate the court to dismiss, rather than transfer, the claims against Feiner. Nichols, 991 F.2d at 1202 n.6; Estate of Bank, 286 F. Supp. 2d at 522; Dee-K Enters., 985 F. Supp. at 645–46. Indeed, "[r]ather than dismissing for improper venue, courts favor finding that it is in the interest of justice to transfer venue." Harley v. Chao, 503 F. Supp. 2d 763, 774 (M.D.N.C. 2007); see Goldlawr, 369 U.S. at 466–67; Porter, 840 F.2d at 257–58; Gov't of Egypt Procurement Office v. M/V ROBERT E. LEE, 216 F. Supp. 2d 468, 473–74 (D. Md. 2002); Jennings v. Entre Computer Ctrs., Inc., 660 F. Supp. 712, 714 (D. Me. 1987).[10] Accordingly, the court rejects Feiner's arguments and transfers the Szuliks' claims against him to the Southern District of New York.

B.

Having decided to transfer the Szuliks' claims against Feiner to the Southern District of New York, the court now determines whether to sever those claims from the rest of the case or to also transfer the Szuliks' claims against the TAG defendants to the Southern District of New York.

Jurisdiction and venue in the Eastern District of North Carolina are proper as to the TAG defendants. Thus, the court first considers transfer of venue as to them under 28 U.S.C. § 1404.[11] Section 1404 permits a district court to transfer "any civil action to any other district . . . where it might have been brought" if such transfer is "[f]or the convenience of [the] parties and witnesses,

---

[10] Some district courts hold that transfer is generally favored unless "there is evidence that a case was brought in an improper venue in bad faith or to harass defendants . . . ." M/V ROBERT E. LEE, 216 F. Supp. 2d at 473; see, e.g., LaFerney v. Citizens Bank of E. Tenn., No. CV 210-169, 2011 WL 4625956, at *2 (S.D. Ga. Sept. 30, 2011) (unpublished); Palmer v. Dau, No. 6:10-cv-248-Orl-19KRS, 2010 WL 2740075, at *2 (M.D. Fla. July 12, 2010) (unpublished). There is no evidence of bad faith or harassment in this case.

[11] When venue and personal jurisdiction are proper in the filing district, transfer of venue is still possible under section 1406. See Porter, 840 F.2d at 257–58; Jenkins, 464 F. Supp. 2d at 494.

[or] in the interest of justice . . . ." 28 U.S.C. § 1404(a).[12]  The court begins by asking whether the case could have been brought in the proposed transferee district.  If so, the court must then decide whether to transfer venue.  See Dacar v. Saybolt LP, No. 7:10-CV-12-F, 2011 WL 223877, at *2 (E.D.N.C. Jan. 24, 2011) (unpublished); Blue Mako, Inc. v. Minidis, 472 F. Supp. 2d 690, 703 (M.D.N.C. 2007); Datasouth Computer Corp. v. Three Dimensional Techs., Inc., 719 F. Supp. 446, 450–51 (W.D.N.C. 1989).

When determining whether the first prerequisite of section 1404(a) is met, courts must independently find that personal jurisdiction and venue would have been proper in the proposed transferee district if the plaintiff had originally filed there.  See Hoffman v. Blaski, 363 U.S. 335, 340–44 (1960).  Here, the Szuliks could have originally sued all defendants in the Southern District of New York.  That district would have had personal jurisdiction over Feiner as an in-state resident, and over the TAG defendants pursuant to the nationwide service of process provision in 15 U.S.C. § 78aa(a).  Venue would have been proper under 28 U.S.C. § 1391(b)(3).  Thus, the Szuliks have met the first prerequisite for a section 1404(a) transfer of venue to the Southern District of New York.

Next, the court must decide whether to transfer the case.  See Dacar, 2011 WL 223877, at *2; Blue Mako, 472 F. Supp. 2d at 703; Datasouth, 719 F. Supp. at 450–51.  Courts consider several factors when determining whether to transfer venue:

---

[12] On December 7, 2011, Congress amended section 1404(a).  See Federal Courts Jurisdiction and Venue Clarification Act § 204.  The amended statute provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented."  28 U.S.C. § 1404(a).  The amended language does not appear to apply retroactively to pending cases, and therefore is not used in this order.  See Federal Courts Jurisdiction and Venue Clarification Act § 205; Denver & Rio Grande, 387 U.S. at 563; Ex parte Collett, 337 U.S. 55, 71 (1949).  But the court need not, and does not, resolve the question of retroactivity.  Both the current and former texts of section 1404(a) permit district courts to transfer venue to any district in which the case could have been brought originally.  Compare 28 U.S.C. § 1404(a), with 28 U.S.C. § 1404(a) (2006) (amended 2011).

23

(1) the plaintiff's initial choice of forum; (2) relative ease of access to sources of proof; (3) availability of compulsory process for attendance of unwilling witnesses, and the cost of obtaining attendance of willing and unwilling witnesses; (4) possibility of a view of the premises, if appropriate; (5) enforceability of a judgment, if one is obtained; (6) relative advantage and obstacles to a fair trial; (7) other practical [considerations] that make a trial easy, expeditious, and inexpensive; (8) administrative difficulties of court congestion; (9) local interest in having localized controversies settled at home; (10) appropriateness in having a trial of a diversity case in a forum that is at home with the state law that must govern the action; and (11) avoidance of unnecessary problems with conflicts of laws.

Charles v. Bradley, No. 5:08-CV-124-F, 2009 WL 1076771, at *2 (E.D.N.C. Apr. 21, 2009) (unpublished); see Dacar, 2011 WL 223877, at *3; Blue Mako, 472 F. Supp. 2d at 703; Datasouth, 719 F. Supp. at 450–51. In balancing these factors, "the district courts have substantial discretion to decide" whether to transfer venue. Datasouth, 719 F. Supp. at 450; see also Stewart Org., Inc. v. Ricoh Corp., 487 U.S. 22, 29 (1988); Brock v. Entre Computer Ctrs., Inc., 933 F.2d 1253, 1257 (4th Cir. 1991); S. Ry. Co. v. Madden, 235 F.2d 198, 201 (4th Cir. 1956); Jenkins, 464 F. Supp. 2d at 493.

When comparing the Eastern District of North Carolina and the Southern District of New York, factors two, three, five, six, ten, and eleven are roughly in equipoise. Factor four is irrelevant. The court therefore focuses on factors one, seven, eight, and nine. On balance, those factors favor transferring the Szuliks' claims against the TAG defendants to the Southern District of New York.

As for factor one, although the Szuliks initially chose to sue in the Eastern District of North Carolina, they did so believing that the court could exercise personal jurisdiction over and that venue would be proper as to all defendants. See Pls.' Mem. Opp'n 9–19. When the court suggested that personal jurisdiction and venue as to Feiner were improper in this district, and when the TAG defendants conceded jurisdiction and venue in the Southern District of New York, the Szuliks requested that the court transfer the entire case to the Southern District of New York. See Pls.' Mem. Opp'n Second Mot. Strike 3–5. The Szuliks' initial choice of forum therefore does not weigh against transferring this case. Indeed, their willingness to litigate in the Southern District of New York weighs heavily in favor of transferring venue to that district.

Factor seven likewise strongly supports transferring the Szuliks' claims against the TAG defendants to the Southern District of New York. The Szuliks' claims against Feiner and the TAG defendants are intertwined and arise largely from the same facts. They involve many of the same securities transactions and the same third parties. See Compl. ¶¶ 47, 53, 62, 71–77, 153–73. The Szuliks even allege that Feiner was an integral part of a larger conspiracy orchestrated by the TAG defendants to defraud the Szuliks. See id. ¶¶ 165–69. Resolving the Szuliks' claims against Feiner will likely require the same witnesses and the same documentary evidence needed to litigate the Szuliks' claims against the TAG defendants. Requiring the Szuliks to pursue claims against Feiner in the Southern District of New York while simultaneously pursuing claims against the TAG defendants in the Eastern District of North Carolina would be inefficient and would waste time, effort, and judicial resources. These considerations strongly support transferring this entire case to the Southern District of New York. Indeed, "[t]o permit a situation in which two cases involving . . . the same issues are simultaneously pending in different District Courts leads to the wastefulness of time, energy and money that § 1404(a) was designed to prevent." Cont'l Grain Co. v. Barge FBL-585, 364 U.S. 19, 26 (1960); see Gen. Tire & Rubber Co. v. Watkins, 373 F.2d 361, 369–70 (4th Cir. 1967) (en banc); Buckland v. Maxim Healthcare Servs., Inc., No. C 10-5145 SBA, 2011 WL 4404126, at *1–2 (N.D. Cal. Sept. 20, 2011) (unpublished); Convergence Techs., 711 F. Supp. 2d at 642–43. Thus, factor seven weighs heavily in favor of transferring the Szuliks' claims against the TAG defendants to the Southern District of New York.

As for factor eight, this court's docket is quite congested. The Eastern District of North Carolina is a very busy federal district court on a case-per-judge basis, and has more pending cases per judge and more weighted filings per judge than the Southern District of New York. Although the Southern District of New York is busy, its docket is less congested than this court's docket. Thus, transferring all of the Szuliks' claims to the Southern District of New York will permit a more expeditious resolution of the case.

Finally, factor nine weighs slightly against transferring this case. The Szuliks were North Carolina residents at all times relevant to this case. See Szulik Aff. ¶¶ 2–7. Their home is in the Eastern District of North Carolina, and they signed the IMA in this district. See id. ¶¶ 4–7. They also had several face-to-face meetings and other communications with Tagliaferri and Cornell in the district. Compl. ¶¶ 24, 78–79, 83–85; Szulik Aff. ¶¶ 8–10.[13] At least some of the misstatements and omissions giving rise to this case occurred during these meetings and communications. See, e.g., Compl. ¶¶ 78–89, 96–130, 136–41. Thus, the Eastern District of North Carolina has a significant connection to this case and an interest in providing a convenient forum for redressing the Szuliks' grievances. Nevertheless, particularly in light of the Szuliks' willingness to litigate in the Southern District of New York, factor nine alone cannot overcome the other factors that weigh heavily in favor of transferring the Szuliks' claims against the TAG defendants to the Southern District of New York.

In sum, after balancing the relevant factors that inform the court's inquiry into the convenience of the parties and witnesses and into the interests of justice, the court transfers the Szuliks' claims against the TAG defendants to the Southern District of New York.

IV.

Accordingly, the court GRANTS plaintiffs' motion to transfer venue to the Southern District of New York and GRANTS the TAG defendants' motion to transfer venue to the Southern District of New York. The court DENIES the TAG defendants' motion to dismiss [D.E. 20] only as it pertains to personal jurisdiction and venue, and DENIES the TAG defendants' motion to transfer venue to the District of Connecticut [D.E. 20]. Likewise, the court DENIES Feiner's motion to dismiss [D.E. 26] only as it pertains to personal jurisdiction and venue, and DENIES Feiner's motion for leave to file a memorandum in opposition to transfer of venue to the Southern District of New York [D.E. 59]. The court also DENIES AS MOOT plaintiffs' motion for leave to file a reply to

---

[13] The TAG defendants dispute some of these facts. See, e.g., TAG Defs.' Mem. Supp. Mot. Dismiss 3–4, 15–16. At this stage of the proceedings, however, all reasonable inferences are drawn in the Szuliks' favor.

26

Feiner's memorandum opposing transfer of venue to the Southern District of New York [D.E. 60].

The court transfers plaintiffs' entire case to the Southern District of New York. All pending motions not expressly granted or denied in this order remain pending, to be resolved by the United States District Court for the Southern District of New York.

SO ORDERED. This **9** day of March 2012.

JAMES C. DEVER III
Chief United States District Judge