USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 8-21-13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
MATTHEW J. SZULIK, KYLE M. SZULIK,
and MICHAEL COLLEARY, in his capacity as
trustee of the Raymond W. Szulik Revocable Trust
dated December 5, 2007,

                Plaintiffs,

     -against-

JAMES S. TAGLIAFERRI, PATRICIA J.
CORNELL, and BARRY B. FEINER,

                Defendants.
------------------------------------------------------------------x

12 Civ. 1827 (PKC)

MEMORANDUM
AND ORDER

P. KEVIN CASTEL, District Judge:

        In a Second Amended Complaint (the "SAC"), plaintiffs allege that James S.

Tagliaferri and Patricia J. Cornell, investment managers, made numerous improper investments

and engaged in a "kickback" scheme with a thoroughbred horse racing company.  Against

Tagliaferri and Cornell, the SAC alleges violations of sections 10(b) and 20(a) of the Securities

and Exchange Act of 1934 and Rule 10b-5 promulgated thereunder, as well as numerous state-

law claims.  The fraud-based claims are based solely on the alleged "kickback" scheme.

Additionally, plaintiffs bring state-law claims against Barry B. Feiner, an attorney who

performed legal work for several of the transactions detailed in the pleading.  Defendants move

to dismiss the complaint for failure to state a claim, pursuant to Rule 12(b)(6), Fed. R. Civ. P.,

and for failure to plead fraud with the particularity required by Rule 9(b), Fed. R. Civ. P., and the

Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b) (the "PSLRA").

        The Court concludes that the SAC alleges adequately the state-law claims against

Tagliaferri and Cornell for breach of fiduciary duty; an accounting; negligence; and unjust

enrichment.  The Court dismisses the negligent misrepresentation claim.  Plaintiffs' fraud-based claims—the four federal securities laws claims, the North Carolina statutory claim, and the fraudulent concealment claim—survive only insofar as they allege that nondisclosure of the "kickback" payments caused plaintiffs to needlessly pay management fees to TAG VI.  The fraud-based claims are otherwise dismissed for failure to allege loss causation and/or proximate cause.  As to Feiner, the Court concludes that the SAC alleges adequately claims for legal malpractice; aiding and abetting breach of fiduciary duty; aiding and abetting fraudulent concealment; and unjust enrichment.

BACKGROUND

For purposes of the Rule 12(b)(6) motions, all nonconclusory factual allegations are accepted as true and reasonable inferences are drawn in favor of plaintiffs as non-movants.

1.  The Parties

Matthew Szulik ("Matthew") and his wife, Kyle Szulik ("Kyle"), who "reside" in North Carolina, bring suit in their individual capacities.[1]  (SAC ¶ 12.)

Matthew and his father, Raymond Szulik ("Raymond"), brought suit as trustees of the Raymond W. Szulik Trust (the "RWS Trust").  (Id. ¶ 13.)  Raymond Szulik passed away on January 15, 2013.  (Docket No. 172.)  The Court granted plaintiffs' motion to substitute as a named plaintiff Michael Colleary, in his capacity as trustee of the Raymond W. Szulik Revocable Trust, in place of Matthew and Raymond, in their capacities as trustees of the RWS Trust.  (Docket No. 187.)  The two trusts merged on May 8, 2013, and the Raymond W. Szulik

---

[1] Plaintiffs allege the parties' states of residence but not the parties' citizenships, which is necessary to assess diversity jurisdiction.

Revocable Trust is the surviving entity.[2]   (Docket No. 180.)

      The Szuliks entrusted funds to the investment advisory firm "TAG VI," a limited liability company ("LLC") organized under the laws of the U.S. Virgin Islands.  (Id. ¶ 16.) Though prior versions of the complaint asserted claims against the entity TAG Virgin Islands, Inc. ("TAG VI, Inc."), that entity filed a Chapter 7 bankruptcy petition and is subject to an automatic litigation stay.  TAG VI, Inc. is omitted as a defendant from the SAC.

      Documents attached to the SAC refer to the entities "Taurus Advisory Group, LLC" (e.g., id. Ex. 3) and "TAG VI, Inc." (E.g., id. Exs. 8, 20.)  Plaintiffs' case caption states that "TAG VI, Inc." was formerly known as "Taurus Advisory Group, LLC."  See Szulik v. TAG Virgin Islands, Inc., 858 F. Supp. 2d 532 (E.D.N.C. 2012).  A 2007 Form ADV indicates TAG VI, Inc. conducted its advisory business under the name Taurus Advisory Group, LLC. (Id. Ex. 2.)  The parties make little effort to differentiate between the various "TAG" entities. The Court refers to the entities as "TAG VI" unless otherwise noted.

      Tagliaferri principally resides in the U.S. Virgin Islands, and Cornell principally resides in Connecticut.  (Id. ¶¶ 14-15.)  At all relevant times, Tagliaferri and Cornell were equal co-owners of TAG VI.  (Id. ¶ 16.)  Both have earned the designation Chartered Financial Analyst (id. ¶¶ 14-15), and were the only Chartered Financial Analysts at TAG VI, which employed fewer than five people.  (Id. ¶ 22.)  TAG VI was registered with the SEC as an Investment Adviser.  (Id. ¶ 17.)  From 2003 to 2008, Tagliaferri and Cornell were registered as TAG VI

---

[2] Tagliaferri asserts that Matthew lacked standing in his capacity as trustee because he was removed as a trustee of the RWS Trust in 2007. Tagliaferri annexes the RWS Trust's 2004 Custody Agreement (Tag. Ex. 4) and a Revocable Declaration of Trust executed by Raymond in December 2007. (Tag. Ex. 5.) Extrinsic evidence may be considered on a motion to dismiss pursuant to Rule 12(b)(1), Fed. R. Civ. P. However, the substitution motion makes plain that the RWS Trust was separate from the Raymond W. Szulik Revocable Trust until the May 2013 merger. Therefore, the Court denies without prejudice Tagliaferri's motion to dismiss on the basis of standing.

Investment Adviser Representatives.  Documents filed with the SEC describe their roles as "responsible for investment decisions which effect client portfolios."  (Id. ¶¶ 20-21, 23; id. Ex. 2.)

Feiner is an attorney licensed to practice in New York.  (Id. ¶ 25.)  Plaintiffs assert Feiner performed legal work in many of the transactions detailed in the SAC, but maintain they were unaware of Tagliaferri and Cornell's associations with Feiner.  (Id. ¶ 59.)

2.  1996 Investment Management Agreement

Matthew met Tagliaferri in the 1980s during a pickup basketball game in Connecticut.  (Id. ¶ 31.)  The two developed a friendship, which "evolved into a trusted mentoring role."  (Id.)  By 1996, Matthew and Kyle had accumulated approximately $500,000 in savings and engaged TAG VI to manage their investments.  (Id. ¶ 32.)

Matthew and Kyle communicated to Tagliaferri and Cornell their investment objectives: "a 'moderately aggressive portfolio' with a mix of 40% large cap, 40% small cap, and 20% bonds."  (Id. ¶ 35.)  Shortly thereafter, Matthew and Kyle moved from New York to North Carolina.  (Id. ¶ 33.)  In March 1996, Tagliaferri or Cornell sent an Investment Management Agreement (the "IMA") to the Szuliks' North Carolina home.[3]  (Id. ¶ 36.)  Matthew and Kyle signed.  Cornell signed on behalf of "Taurus Advisory Group, LLC."  (Id. ¶¶ 37-38; id. Ex. 3.)

The IMA provided TAG VI with discretionary authority to "make purchases, sales, and otherwise effect transactions in stocks, bond (sic), and other securities."  (Id. ¶ 39; id. Ex. 3.)  It did not permit TAG VI to make unsecured loans to individuals or fund mortgages.  (Id.

---

[3] The IMA indicates Taurus Advisory Group, LLC was then a Delaware LLC with its principal office located in Connecticut.  (SAC Ex. 3.) The IMA, by its terms, is governed by Connecticut law.  (Id.)

¶ 41.)  The agreement provided that TAG VI would be paid an annual fee of 1% of assets under management, payable on a quarterly basis.  (Id. ¶ 42; id. Ex. 3.)  Tagliaferri and Cornell periodically issued TAG VI invoices to collect the fees.  (Id.)  The Szuliks engaged State Street Bank ("State Street")—previously Investors Bank & Trust ("IBT") and Chemical Bank—as asset custodian.[4]  (Id. ¶ 43.)

Matthew became President of Red Hat, Inc. ("Red Hat"), a North Carolina software company, in 1998, and directed its IPO the next year.  (Id. ¶¶ 44-45.)  Over the course of the next decade, Red Hat became a multi-billion dollar S&P 500 company.  (Id. ¶ 46.)  Matthew's wealth grew, as did his portfolio with TAG VI.  (Id. ¶ 50.)  Until approximately 2006, the Szuliks' portfolio exceeded $60 million "substantially invested in high quality stocks and bonds."  (Id. ¶ 72.)  Matthew and Kyle continued to entrust "their investments to the complete discretion of TAG VI and its principals" (id. ¶ 51), as they had come to view "Tagliaferri and Cornell as trusted friends and advisers."  (Id. ¶ 87.)

In the mid-2000s, Tagliaferri and Cornell also began managing accounts for Raymond.[5]  (Id. ¶ 61.)  As Raymond was in his 90s, preservation of capital and liquidity were of paramount importance.  (Id. ¶ 62.)  Plaintiffs do not allege there was an investment management agreement for the RWS Trust or that the trust paid fees to TAG VI.

3.  Portfolio Transformation

At some point in 2005 or 2006, Cornell and Tagliaferri "became involved with"

---

[4] The Szuliks have filed a separate federal action against State Street.  (SAC ¶ 323.)  Other former TAG VI clients have filed a class action against State Street.  (Id. ¶ 322.)

[5] TAG VI also managed trusts for Matthew's children.  The Szuliks instructed that funds in the children's trusts be invested in "ultra safe, liquid securit[ies]."  (SAC ¶ 67.)  Earlier versions of the complaint asserted claims on behalf of the children's trusts.  A voluntary dismissal was filed on July 23, 2012.  (Docket No. 102.)

Feiner, who is alleged to have connections to business persons alleged to be disreputable, including members of the Galanis family.[6]  (Id. ¶¶ 52-60.)  TAG VI relocated to the U.S. Virgin Islands in 2006.  (Id. ¶ 74.)  The same year, without notifying plaintiffs, Tagliaferri and Cornell "began to gradually liquidate the Szuliks' more conservative investments and replace them with securities that turned out to be worthless."  (Id. ¶ 73.)  Tagliaferri and Cornell also "used the Szuliks' money to make unsecured, non-recourse loans to individuals and entities."  (Id.)

The fraud-based claims are based on a purported "kickback" scheme between TAG VI, Tagliaferri, Cornell, and International Equine Acquisitions Holdings, Inc. ("IEAH"), a small private company engaged in the thoroughbred horse racing business.  According to the SAC, IEAH had a history of corporate mismanagement and its founder, Michael Iavarone, was once fined and enjoined from selling securities by the National Association of Securities Dealers.  (Id. ¶¶ 93, 95; id. Ex. 5.)  It is alleged that between March 2007 and January 2009 Tagliaferri and Cornell invested approximately $20 million of Matthew and Kyle's money and another $650,000 from the RWS Trust in IEAH promissory notes, the majority of which were memorialized in "convertible note agreements" naming TAG VI, Inc. and not the Szuliks as payee.[7]  (Id. ¶¶ 101-07; e.g., id. Ex. 6.)  "TAG VI then executed 'subnotes' to the Szuliks and other TAG clients whose funds they had raided to pay for [the] racehorses."  (Id. ¶ 107.)

Plaintiffs allege that TAG VI received "kickbacks" on the "front end" when notes were issued and on the "back end" when notes were converted to equity.  (Id. ¶ 125.)  For

---

[6] Members of the Galanis family, though not defendants in the action, are frequently referenced throughout the pleadings in connection with various investments.

[7] On at least one occasion, Matthew and Kyle's money was also used to buy IEAH stock, which was issued in the names of Hare & Co. and Hunter & Co.  (SAC ¶ 108.)  Tagliaferri attaches the custody agreement for Matthew and Kyle's portfolio, and maintains these entities were the custodial bank's nominees.  (Tag. Mem. at 3; Tag. Ex. 2.)

example, in March 2007, TAG VI and IEAH entered into a $1 million convertible note agreement.  TAG VI received a 5% "kickback," and the remaining $950,000 was wired through Feiner's escrow account to IEAH.  When the note was converted to IEAH equity in 2008, TAG VI received an additional $50,000.  (Id. ¶ 140.)  Feiner purportedly structured the IEAH convertible note agreements so that TAG VI, and not the Szuliks, was the payee and had decision-making authority to convert the notes to equity.  (Id. ¶¶ 107, 138.)

Tagliaferri and Cornell also received ownership interests in horses the Szuliks' funds were used to purchase.  (Id. ¶¶ 126, 145-46.)  These interests were held by a separate LLC controlled by Tagliaferri.  (Id. ¶ 127.)

Each IEAH note had a corresponding security and inducement agreement, which Feiner intentionally drafted to ensure that the holder of the note had no recourse.  (Id. ¶¶ 141-42; id. Ex. 12; see also id. ¶ 144 (failure to file UCC filings to perfect security interests in horses).)  Note documentation was often not drafted or timely delivered to IEAH, leaving the company's records in disarray.  (Id. ¶¶ 110-13.)  The Szuliks were not provided with information regarding the extent of the IEAH investments at the time they were made.  (Id. ¶ 117.)  Due to the opaque structuring of the notes, IEAH remains unable to confirm the existence or extent of the Szuliks' holdings in the company.  (Id. ¶ 109.)

TAG VI became IEAH's most significant source of capital.  Tagliaferri and Cornell "gained control over IEAH" and "demanded to install their associates" on its board.  (Id. ¶¶ 118-22.)  It is alleged that Tagliaferri exercised such control in January of 2008 when he extended a two-week loan from the Szuliks' account to IEAH, demanding that "$80,000 be skimmed off the top of the loan amount and paid" to TAG VI.  (Id. ¶¶ 147-151; id. Ex. 13.)  Feiner stated in an e-mail that the associated note would bear 0% interest and 25,000 IEAH

shares were to be issued to Matthew as inducement.[8]  (Id. ¶¶ 159-61; id. Ex. 13.)  The transaction did not benefit the Szuliks, who received only "worthless stock" as consideration.  (Id. ¶ 160.)

The Szuliks came to learn of Iavarone's "checkered history" in May 2008.  (Id. ¶ 97.)  But Tagliaferri assured Matthew that "he should trust Iavarone and that the business was sound."  (Id. ¶ 99.)  Matthew believed this representation.  (Id.)  Nevertheless, in or around June 2008, the SEC launched an investigation of IEAH.  Prior to June 2008, Cornell demanded access to IEAH's books.  (Id. ¶¶ 164, 167-68.)  Plaintiffs allege, upon information and belief, that Cornell and Tagliaferri realized IEAH documents being produced to the SEC would show clear violations of their duties under the Investment Advisers Act of 1940.  15 U.S.C. § 80b-1 et seq. Tagliaferri and Cornell "cover[ed] their tracks" by preparing backdated invoices characterizing the "kickbacks" as "consulting services" and delivering the invoices to IEAH.  (Id. ¶¶ 171-74.)

The Szuliks received evidence of the payments in February 2010, when a former TAG VI attorney provided copies of the purportedly backdated invoices.  (Id. ¶ 317.)  The Szuliks assert they have uncovered at least 14 "kickbacks" paid from "Feiner's escrow account or IEAH's corporate bank account to TAG VI's Merchant Commercial Bank account or" other accounts.  (Id. ¶ 130.)  It is alleged that Tagliaferri and Cornell received more in so-called "kickback" payments than the Szuliks received from their $20 million investment.  (Id. ¶ 129.)

The complaint details numerous other investments made by Tagliaferri and Cornell on behalf of the Szuliks or the RWS Trust, including:[9]

---

[8] A January 17, 2008 e-mail from Tagliaferri to Iavarone indicates the loan would have "a maturity date of 1/31/08" (SAC Ex. 13) and an account statement reflects that $800,000 was wired into the Szuliks' account on January 31, 2008.  (Id.)  However, a January 19, 2008 e-mail from Feiner to Iavarone states the note "will be due on 7/31/08."  (Id.)  Whether the term of the loan was six months or two weeks does not impact the Court's conclusions.

[9] The SAC does little to differentiate which investments were made with funds from the RWS Trust and which were made with Matthew and Kyle's funds.  The complaint specifically mentions that funds from the RWS Trust were

- A $10 million acquisition of equity in and a note issued by Protein Polymer Technologies, Inc. ("PPTI"). (Id. ¶¶ 193-99.) After several extension agreements and despite numerous defaults, the $1 million loan made by TAG VI as Matthew's "Agent" in 2006 became a $6.4 million outstanding indebtedness by January 2008. (Id. ¶¶ 209-15; id. Ex. 14.)

- A $19 million investment in Conversion Services International ("Conversion Services"), a data warehousing business that lost money almost every year since 2004. (Id. ¶¶ 236-37, 240.)

- A $3.75 million loan to Paseo de la Reformer Partners, LLC ("Paseo"), a Nevada LLC on revoked status associated with Jared Galanis, whose assets included a Mexican commercial building housing a "gentlemen's club." (Id. ¶¶ 249-52.)

- An $873,000 mortgage for Jason Galanis's Los Angeles mansion, which was held by 1920 Bel Air, LLC. (Id. ¶¶ 261-67.)

- Personal loans to Conversion Services CEO Scott Newman (id. ¶ 268); IEAH investor Andrew Cohen (id. ¶¶ 269-77); and Marvin Ceder. (Id. ¶ 279.)

- A $500,000 loan to a Florida LLC. (Id. ¶¶ 280-282.)

- A $1.7 million "disbursement" to "Jared M. Galanis, PC Escrow Account." (Id. ¶ 283.)

Feiner's legal services facilitated many of the investments. For instance, he drafted notes and other documents for several of the transactions and funds that flowed through his escrow account. He purportedly served as an attorney on both sides of the PPTI note transactions. (Id. ¶¶ 205, 215, 227.) The SAC alleges that he failed to (1) perfect the Szuliks' security interests in the PPTI note and subsequent amendments (id. ¶¶ 208, 220), and (2) record a mortgage securing the Paseo note. (Id. ¶ 256.) Without the Szuliks' knowledge or consent, Feiner acted as their lawyer in at least one purchase of Conversion Services stock (id. ¶ 246) and in the Paseo note transaction. (Id. ¶ 255.)

---

invested in IEAH, but allegations discussing other investments often generically refer to the "Szuliks' funds." As the "Szuliks" is defined in the SAC to include Matthew, Kyle, and Raymond (SAC ¶ 1), the Court assumes the allegations regarding those investments apply to all plaintiffs unless otherwise noted.

Numerous face-to-face meetings took place between June 2006 and April 2009. All were attended by Tagliaferri and several by Cornell. (Id. ¶ 79.) "At each of these meetings, Tagliaferri assured the Szuliks that he and Cornell were following their investment objectives and that their 'money was safe.'" (Id. ¶ 80.) Cornell assured the Szuliks that defendants were "prudently managing" the funds. (Id.) The Szuliks reiterated their "moderately aggressive" portfolio objective and Raymond's "conservative, preservation of principal strategy." (Id. ¶ 78.) "At no time did Tagliaferri or Cornell advise the Szuliks of the transformation of their portfolio and Raymond's portfolio." (Id. ¶ 88.) The Szuliks never requested that Tagliaferri or Cornell change their investment objectives. (Id. ¶ 89.)

The Szuliks received statements from TAG VI and State Street summarizing investments, showing steady growth, and reporting assets at full value. (Id. ¶ 83.) Thus, the Szuliks continued to pay the 1% management fee based on inflated asset values. According to plaintiffs, had assets been reflected at their true values, TAG VI "would have received little or no compensation." (Id. ¶¶ 132-33.)

Matthew retired in December 2007, prompting a meeting with Tagliaferri and Cornell to discuss the family's future investment objectives. (Id. ¶¶ 293-94.) Matthew and Kyle stressed that their objectives were "security and monthly income." (Id. ¶ 295.) Tagliaferri and Cornell "assured the Szuliks that they would be able to extract $1 million annually from their portfolio . . . ." (Id. ¶ 296.) Tagliaferri and Cornell represented that the portfolio was "safe" and was "being invested consisted (sic) with the Szuliks' stated investment objectives." (Id.)

Matthew, now having time to focus on financial planning, became concerned about the portfolio's composition in 2008. (Id. ¶ 297.) Tagliaferri, however, had become difficult to reach. (Id. ¶ 298.) The Szuliks retained another investment adviser, directed TAG VI

to liquidate the notes under their management, and instructed that no future investment decisions be made without the Szuliks' approval. (Id. ¶¶ 299-300.)  The new investment adviser obtained information about the portfolio, including that several notes were in default. (Id. ¶¶ 301-02.) Tagliaferri and Cornell offered no explanation. (Id. ¶ 306.)

In September of 2008, Matthew instructed Tagliaferri and Cornell, "to move [Raymond's] position to cash or a secure, highly liquid investment," explaining that due to Raymond's poor health, "[i]t is very important that the assets in his account be liquid/no risk." (Id. ¶ 63 (alterations in original); id. Ex. 4.)   Notwithstanding these instructions, by December 31, 2009 less than 5% of Raymond's portfolio was liquid. (Id. ¶ 66.)

Finally, in July of 2009, Matthew and Kyle terminated the IMA. (Id. ¶ 309.) They allege that Tagliaferri and Cornell continued to operate as if the IMA was in effect by executing another note extension with PPTI. (Id. ¶ 312 (citing id. Ex. 14).)  Despite promises that TAG VI would sell some of the investments, the transactions never occurred. (Id. ¶ 314.)

4. Procedural History

This action was filed in the United States District Court for the Eastern District of North Carolina on December 23, 2010.[10]   (Docket No. 1.)  Jointly represented, Tagliaferri, Cornell, and then-defendant TAG VI, Inc., moved to dismiss the complaint, asserting the federal claims were time-barred, the district court lacked personal jurisdiction, venue was improper, and the complaint failed to state a claim.  In a March 12, 2012 Memorandum and Order, Chief Judge James C. Dever III concluded that plaintiffs' section 10(b) claims were not time-barred.  The Judge concluded that the court lacked personal jurisdiction over Feiner and transferred the entire

---

[10] Other TAG VI investors have also brought suit. (SAC ¶¶ 320-21.)  In February of 2013, a federal grand jury sitting in this District indicted Tagliaferri for investment adviser fraud, securities fraud, and wire fraud. United States v. Tagliaferri, 13 Cr. 115 (S.D.N.Y.).

12

action to this District, pursuant to 28 U.S.C. §§ 1404(a), 1406(a), without reaching the claims on the merits. Szulik, 858 F. Supp. 2d at 550.

Plaintiffs filed a First Amended Complaint (the "FAC") on June 15, 2012, and filed the SAC on August 10, 2012.  Subject matter jurisdiction is premised on both federal question and diversity jurisdiction.  See 28 U.S.C. §§ 1331, 1332.  The SAC brings claims against Tagliaferri, now proceeding pro se, and Cornell for violations of sections 10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§ 78j,78t, and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5; violation of the North Carolina Investment Advisers Act, N.C. Gen. Stat. § 78C; breach of fiduciary duty; fraudulent concealment; negligence; negligent misrepresentation; unjust enrichment; and an accounting.  The SAC asserts claims against Feiner for legal malpractice; aiding and abetting breach of fiduciary duty; aiding and abetting fraudulent concealment; and unjust enrichment.  In separate motions, the three remaining defendants move to dismiss the complaint pursuant to Rules 12(b)(6) and 9(b), Fed. R. Civ. P., as well as the PSLRA.

LEGAL STANDARDS UNDER RULE 12(b)(6), RULE 9(b), and the PSLRA

"To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.'"  ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 196 (2d Cir. 2009) (quoting Ruotolo v. City of New York, 514 F.3d 184, 188 (2d Cir. 2008) (internal quotation marks and citation omitted)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  "A complaint alleging securities fraud must satisfy the heightened pleading requirements of the PSLRA and Federal Rule of Civil Procedure

9(b) by stating with particularity the circumstances constituting fraud." Slayton v. Am. Express Co., 604 F.3d 758, 766 (2d Cir. 2010).

Rule 9(b) requires a party to state with particularity the circumstances constituting fraud. ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007). This pleading threshold gives a defendant notice of the plaintiff's claim, safeguards a defendant's reputation from "improvident" charges, and protects against strike suits. Id. The pleadings must "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 186-87 (2d Cir. 2004) (quoting Harsco Corp. v. Segui, 91 F.3d 337, 347 (2d Cir. 1996)). Though Rule 9(b) pleadings may not be based upon information and belief, "[t]here is a recognized exception to this rule, . . . [F]raud allegations may be so alleged as to facts peculiarly within the opposing party's knowledge, in which event the allegations must be accompanied by a statement of the facts upon which the belief is based." DiVittorio v. Equidyne Extractive Indus., Inc., 822 F.2d 1242, 1247 (2d Cir. 1987).

The PSLRA imposes "heightened pleading requirements and a loss causation requirement upon 'any private action' arising from the Securities Exchange Act." Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc., 552 U.S. 148, 165 (2008) (quoting 15 U.S.C. § 78u–4(b)). If the plaintiff alleges a false statement or omission, the PSLRA "insists that securities fraud complaints 'specify' each misleading statement; that they set forth the facts 'on which [a] belief that a statement is misleading was 'formed'; and that they 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 345 (2005) (alteration in original)

(quoting 15 U.S.C. § 78u–4(b)(1), (2)).  The Second Circuit has repeatedly required plaintiffs to

"do more than say that the statements . . . were false and misleading; they must demonstrate with

specificity why and how that is so."  Rombach v. Chang, 355 F.3d 164, 174 (2d Cir. 2004).

ANALYSIS

I.  Tagliaferri and Cornell

A.  Consideration of Materials Extraneous to the Complaint

       This Court's September 11, 2012 Order warns that any motion to dismiss must be

"limited to the four corners of the pleading and any material incorporated therein . . . ." (Docket

No. 108.)  Yet, Tagliaferri's moving brief marshals 20 exhibits to tell a competing version of the

facts.[11]

       "[T]he complaint is deemed to include any written instrument attached to it as an

exhibit or any statements or documents incorporated in it by reference."  Chambers v. Time

Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002) (quoting Int'l Audiotext Network, Inc. v. Am.

Tel. & Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995) (per curiam)).  "Where a document is not

incorporated by reference, the court may nevertheless consider it where the complaint 'relies

heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint."

DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010) (quoting Mangiafico v.

Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006) (quoting Chambers, 282 F.3d at 152-53)).  "[A]

plaintiff's *reliance* on the terms and effect of a document in drafting the complaint is a necessary

prerequisite to the court's consideration of the document on a dismissal motion; mere notice or

possession is not enough."  Chambers, 282 F.3d at 153.  "[E]ven if a document is integral to the

---

[11] Plaintiffs' opposition to the motion includes a useful appendix indicating which of Tagliaferri's exhibits contain documents not attached to the SAC.  Tagliaferri's reply brief is accompanied by an appendix putting forth the basis for each exhibit's inclusion.

complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document." DiFolco, 622 F.3d at 111 (internal quotation marks and citation omitted).

The SAC annexes numerous custodial account statements. Tagliaferri also submits account statements, which are hand-marked to emphasize that certain payments were made. Plaintiffs' claim for an accounting maintains that defendants did not appropriately account for transactions and as a result, statements provided to plaintiffs were "unclear" and "effectively prevented the Szuliks from understanding the nature of transactions being made on their behalf . . . ." (SAC ¶¶ 363-64.) The parties are currently engaged in discovery and the claims may look quite different at the summary judgment stage. Allegations in the SAC regarding certain investments will not be dismissed on the basis of defendant's contrary view of the facts.

Tagliaferri maintains the Szuliks' portfolio was always "risk-prone with major stakes in development stage companies." (Tag. Mem. at 6.) He annexes Matthew and Kyle's custody agreement with Chemical Bank (Tag. Ex. 2), various 2005 account statements, and TAG VI's 2005 "Performance Summary" (Tag. Ex. 3), asserting such documents are appropriately considered because the SAC repeatedly refers to statements and other communications received from TAG VI and State Street. Though plaintiffs include account statements for later periods, the 2005 materials are not integral to the complaint. According to Tagliaferri, the parties did not establish "moderately aggressive" portfolio objectives or account guidelines. He attaches a January 25, 1996 e-mail exchange referenced in the pleading (Tag. Ex. 1) and maintains that Cornell was merely responding to a "hypothetical question." Though the e-mail could be construed to support Tagliaferri's version of the facts, the Court accepts the well-pleaded

allegations of the SAC as true.  The Court's consideration of the e-mail does not impact the
outcome of the motion.

With regard to the alleged "kickback" scheme, Tagliaferri urges that TAG VI
earned *legitimate* and *disclosed* consulting fees from IEAH, pursuant to a 2007 agreement which
promised between 5% and 10% of all capital invested in IEAH to TAG VI, Inc., its financial
advisor.  (Tag. Ex. 6.)  Tagliaferri also includes a 2011 declaration signed by Michael Iavarone,
who describes the nature of the payments, as well as dated e-mails and faxes, which Tagliaferri
asserts transmitted the invoices plaintiffs claim were backdated.  (Tag. Exs. 7, 8.)  A 2008 letter
from Tagliaferri to the Szuliks, which is referenced in paragraph 106 of the *initial* complaint,
states "For the record, we have received fees from IEAH for assisting in the negotiations of a
possible sale and have provided other consulting services to the company.  This raises the
potential for a conflict of interest among TAG VI, its clients and IEAH."  (Tag. Ex. 10.)  Finally,
Tagliaferri asserts that the SAC mischaracterizes the $800,000 loan to IEAH.  According to
Tagliaferri, the SAC includes the January 19, 2008 e-mail from Feiner to Iavarone regarding the
$800,000 loan but fails to include relevant attachments to that e-mail, including a Security
Agreement and the Note.  (Tag. Ex. 9.)  None of these exhibits is properly considered.

Several exhibits relate to other investments discussed in the pleading.  For
example, with regard to PPTI, Tagliaferri attaches a 2002 SEC filing addressing company risk
factors (Tag. Ex. 12) and a 2009 letter from plaintiffs' counsel.  (Tag. Ex. 11.)  Tagliaferri
includes the Paseo operating agreement and a common stock purchase warrant.  (Tag. Ex. 15.)
He attaches a $400,000 note for the Scott Newman loan, as well as IBT and State Street account
statements reflecting interest payments and repayment of the note's principal.  (Tag. Ex. 14.)
The motion annexes documentation for several other transactions, including the 1920 Bel Air,

Cohen, Ceder and Florida LLC loans. (Tag. Exs. 16-19.) Tagliaferri includes an e-mail from plaintiffs' counsel stating that the Szuliks refused to sell their securities to any party other than TAG VI because plaintiffs had "virtually no information" pertaining to the investments. (Tag. Ex. 13.) The exhibits, save those attached to the SAC and the public SEC filing, are not properly considered on the present motion. At the summary judgment stage or at trial, such evidence may be considered.

B. Non-Fraud Based Claims

1. Choice of Law

In general "[a] federal court sitting in diversity or adjudicating state law claims that are [supplemental] to a federal claim must apply the choice of law rules of the forum state." Rogers v. Grimaldi, 875 F.2d 994, 1002 (2d Cir. 1989). However, in diversity cases, where a party "seek[s] transfer, the transferee district court must be obligated to apply the state law that would have been applied if there had been no change of venue." Van Dusen v. Barrack, 376 U.S. 612, 639 (1964); see Ferens v. John Deere Co., 494 U.S. 516, 519 (1990) (Van Dusen rule applicable where plaintiff moves to transfer). Here, plaintiffs, Tagliaferri, and Cornell all supported the transfer to this District from the Eastern District of North Carolina. Applying the Van Dusen rule, the Court applies North Carolina choice of law rules.

Under North Carolina law, "lex loci delicti . . . is the appropriate choice of law test to apply to tort claims." Harco Nat. Ins. Co. v. Grant Thornton LLP, 698 S.E.2d 719, 722 (N.C. Ct. App. 2010). "For actions sounding in tort, the state where the injury occurred is considered the situs of the claim." Boudreau v. Baughman, 368 S.E.2d 849, 854 (N.C. 1988). "The plaintiff's injury is considered to be sustained in the state 'where the last act occurred giving rise to [the] injury.'" Harco, 698 S.E.2d at 724 (alteration in original) (citation omitted).

Here, the injury occurred in North Carolina.  While the place of injury is not necessarily where plaintiffs reside, in this particular case there is no sufficiently strong reason to conclude plaintiffs suffered harm in one of the other jurisdictions implicated in the case: New York, Connecticut, and the U.S. Virgin Islands.   The Court applies North Carolina law to the state-law claims asserted against Tagliaferri and Cornell, reserving its right to revisit the issue on a more complete record.

2.  Breach of Fiduciary Duty (Count I)

"As an independent cause of action, [b]reach of fiduciary duty is a species of negligence or professional malpractice." Gerringer v. Pfaff, No. COA12-785, 2013 WL 601106, at *3 (N.C. Ct. App. Feb. 19, 2013) (alteration in original) (internal quotation marks and citation omitted).  A fiduciary relationship exists "in all cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence." HAJMM Co. v. House of Raeford Farms, Inc., 403 S.E.2d 483, 489 (N.C. 1991) (internal quotation marks and citation omitted). Whether a fiduciary relationship exists between parties, in a context such as this, is a fact-based question.  See Carcano v. JBSS, LLC, 684 S.E.2d 41, 53 (N.C. Ct. App. 2009).  "[F]iduciaries must act in good faith.  They can never paramount their personal interest over the interest of those for whom they have assumed to act." Albert v. Cowart, 727 S.E.2d 564, 570 (N.C. Ct. App. 2012) (alteration in original) (internal quotation marks and citation omitted).

"When a breach of fiduciary duty claim is premised upon fraudulent misconduct, Rule 9(b) applies." Sheppard v. Manhattan Club Timeshare Ass'n, Inc., 11 Civ. 4362, 2012 WL 1890388, at *8 (S.D.N.Y. May 23, 2012).  The parties dispute whether Rule 9(b)'s particularity requirements apply only to allegations concerning predicate acts of fraud, or also to allegations

establishing a duty.  The existence of a fiduciary relationship and the duties that attend such a

relationship are well-pled under either Rule 8(a), Fed. R. Civ. P., or Rule 9(b).

      Tagliaferri and Cornell co-owned TAG VI and were the only Certified Financial

Analysts at the firm, which employed fewer than six people.  Indeed, the 2007 Form ADV lists

only Tagliaferri and Cornell as persons "responsible for investment decisions which effect client

portfolios." (SAC Ex. 2.)  Cornell signed the 1996 IMA, the basis of TAG VI's "discretionary

authority" over Matthew and Kyle's portfolio.[12]  TAG VI invested the Szuliks' funds in

numerous companies.  See Kettle v. Leonard, No. 11 Civ. 189, 2012 WL 4086595, at *10-

11 (E.D.N.C. Sept. 17, 2012) ("Although the North Carolina courts do not appear to have

addressed the issue of whether a financial advisor owes a fiduciary duty to a customer, courts in

other jurisdictions have acknowledged the fiduciary nature of such a relationship.").

      Cornell asserts that the SAC fails to allege *she* made any discretionary choices

regarding *plaintiffs'* funds, as opposed to other TAG VI clients.  Cf. A.I.A. Holdings, S.A. v.

Lehman Bros., Inc., No. 97 Civ. 4978, 1999 WL 47223, at *6 (S.D.N.Y. Feb. 3, 1999) ("Under

New York law there is no fiduciary duty owed to . . . the customers of a corporation by a

controlling shareholder, officer, or director of a corporation.").  However, the SAC alleges that

Cornell was responsible for management of the Szuliks' portfolio (SAC ¶ 229) and attended

several meetings with Tagliaferri and the Szuliks to discuss investment management.  (Id. ¶ 76.)

A reasonable reading of complaint is that the Szuliks entrusted their funds to Tagliaferri as well

---

[12] The Court notes a North Carolina federal district court has held a breach of fiduciary duty claim is barred by the
economic loss doctrine where the claims related to the performance of an investment management agreement.
Wilkins v. Wachovia Corp., 10 Civ. 249, 2011 WL 1134706, at *2 (E.D.N.C. Mar. 24, 2011) (Dever, J.) ("Here,
plaintiff's fiduciary duty claims arise out of the duties in the investment management agreement and relate to
contract performance.  As such, the court predicts that the North Carolina Supreme Court would rely on the
economic loss doctrine to bar the claims.").  Defendants do not raise the economic loss doctrine as a basis for
dismissal at the motion to dismiss stage.

as Cornell, and relied upon the two for investment decision-making expertise and advice. See
White v. Consol. Planning, Inc., 603 S.E.2d 147, 155 (N.C. Ct. App. 2004) (concluding
plaintiffs' adequately pled existence of a fiduciary relationship where "'[b]ecause of [the
Whites'] lack of expertise in financial affairs,' they relied upon [defendants] to properly manage
their funds." (first and second alteration in original)).   Thus, the SAC adequately alleges that
Tagliaferri and Cornell owed a fiduciary duty to the Szuliks and the RWS Trust.

The SAC adequately alleges that Tagliaferri and Cornell purportedly breached the
duties of loyalty and care by (1) advancing their own interests at the Szuliks' expense (SAC ¶¶
354-55); (2) making unauthorized, unsuitable investments (id. ¶ 357); and (3) concealing or
failing to disclose material facts, which are set forth at length in a single paragraph of the SAC.[13]
(Id. ¶ 358.) The Court concludes the allegations that Tagliaferri and Cornell breached their
fiduciary duties to plaintiffs by accepting "kickback" payments from IEAH (id. ¶ 356), which

---

[13] "At no time during the face-to-face meetings or in the written communications and telephone conversations
described in paragraphs 76 through 81 did Tagliaferri or Cornell disclose to any of the Szuliks that: a. They did not
follow the Szuliks' investment objectives; b. They had radically transformed the Szuliks' investment portfolio; c.
They had liquidated recognizable securities in the Szuliks' investment portfolio and re-invested the proceeds in
penny stocks, thinly-traded securities, and private notes to individuals and entities; d. They had concentrated a
majority of the Szuliks' investment portfolio in several illiquid, thinly-traded securities that were wholly unsuitable
for the Szuliks; e. IEAH had paid kickbacks to TAG VI in connection with the Szuliks' purchases of notes and
equity; f. Cornell had threatened to cut off funding to IEAH unless she was given access to IEAH's financial
documents; g. They had created or directed the creation of backdated invoices to conceal from the SEC (and the
Szuliks) the true nature of the IEAH kickbacks paid to IEAH; h. TAG VI had received an ownership interest in
certain racehorses in connection with the Szuliks' purchases of IEAH notes and equity; i. Feiner was acting as the
Szuliks' attorney in connection with some of the investments; j. Feiner's representation of multiple parties in certain
transactions created a conflict of interests; k. Feiner had a long association with the Galanis family both as a lawyer
and serving as an officer in their companies; l. The Szuliks' money was being used to fund businesses operated by,
and to make loans to, members of the Galanis family; m. Members of the Galanis family were convicted felons,
barred from serving as directors and officers of public companies, and were widely reported to be orchestrating
Ponzi schemes and pump-and-dump schemes; n. Despite the requirement in documents he drafted giving a security
interest in certain assets to the Szuliks, Feiner did not perfect those security interests so that the underlying assets
remained freely transferable; o. IEAH's CEO had been fined and suspended from selling securities by the NASD; p.
They were using the Szuliks' investments and other TAG VI clients' investments to gain control of certain entities;
q. The management fee paid to TAG VI was grossly inflated because the investments listed in the Szuliks' accounts
were worth far less than the amounts reflected on the account statements; r. The payors of certain promissory notes
for which the Szuliks were the true beneficial payees had defaulted on the notes; s. The Szuliks' funds were being
used to indirectly fund a Mexican strip club; or t. PPTI repeatedly defaulted on notes but TAG VI continued to roll
over the accrued interest and increase the principal of the note." (SAC ¶ 291.)

sound in fraud, are pled with sufficient particularity under Rule 9(b). Thus, the Court denies the motions to dismiss Count I.

3. Accounting and Negligence (Counts II and IX)

To state a claim for an accounting, plaintiffs must allege the existence of a fiduciary duty. Team 7, LLC v. Protective Solutions, Inc., 759 F. Supp. 2d 698, 707 (E.D.N.C. 2010) ("An accounting is an equitable remedy for alleged breaches of fiduciary duties . . . ."). To state a claim for negligence, plaintiffs must allege that defendants owed a duty of care to plaintiffs. Bartlett v. Wayne County Bd. of Educ., No. COA12-672, 2013 WL 1901638, at *3 (N.C. Ct. App. May 7, 2013) ("To establish negligence, plaintiffs must prove that (1) defendant owed plaintiffs a duty of care; (2) the actions or failure to act by defendant's named employee breached that duty; (3) this breach was the actual and proximate cause of plaintiffs' injury; and (4) plaintiffs suffered damages as a result of the breach."). The only basis defendants raise to dismiss these claims is plaintiffs' failure to plead the duty elements.[14] Having determined the SAC adequately alleges Tagliaferri and Cornell owed fiduciary duties, the Court concludes the SAC adequately states claims for an accounting and negligence.

4. Unjust Enrichment (Count XIV)

Plaintiffs urge it is against equity and good conscience for defendants to retain the IEAH "kickbacks" paid to TAG VI, management fees paid to TAG VI, and any other undisclosed payments. (SAC ¶ 451.) To prove a claim for unjust enrichment, plaintiffs must establish "(1) a measurable benefit was conferred on the defendant[s], (2) the defendant[s] consciously accepted that benefit, and (3) the benefit was not conferred officiously or gratuitously." Lake Toxaway Cmty. Ass'n, Inc. v. RYF Enters., LLC, 742 S.E.2d 555,

---

[14] The Court rejects Tagliaferri's contention that Rule 9(b) applies to the negligence claim.

561 (N.C. Ct. App. 2013) (quoting Primerica Life Ins. Co. v. James Massengill & Sons Constr. Co., 712 S.E.2d 670, 677 (N.C. Ct. App. 2011) (citation omitted)).  "The doctrine of unjust enrichment is based on 'quasi-contract' or contract 'implied in law' and thus will not apply . . . where a contract exists between two parties."  Atl. & E. Carolina Ry. Co. v. Wheatly Oil Co., Inc., 594 S.E.2d 425, 429 (N.C. Ct. App. 2004).

Tagliaferri asserts the claim is barred by the IMA.  Cornell asserts the claim must be dismissed because all benefits accrued to TAG VI, and plaintiffs do not put forth allegations to pierce the corporate veil.  See Bigio v. Coca-Cola Co., 675 F.3d 163, 177 (2d Cir. 2012), cert. denied, 133 S. Ct. 952 (2013).  Plaintiffs' unjust enrichment claim may be no more than a breach of contract claim.  However, without the benefit of a fully-developed record, the precise nature of many transactions remains unclear.  The Court concludes it is premature to dismiss the unjust enrichment claim and denies the motions to dismiss Count XIV as to Tagliaferri and Cornell.

C.  Fraud-Based Claims

1.  Group Pleading

As mentioned, the fraud-based claims focus solely on the alleged IEAH "kickback" scheme.  Tagliaferri and Cornell assert the SAC engages in impermissible "group pleading" by treating them as a unit.[15]  See Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993) ("Rule 9(b) is not satisfied where the complaint vaguely attributes the alleged fraudulent statements to 'defendants.'").  "Where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his

---

[15] Tagliaferri also asserts plaintiffs fail to differentiate which allegations pertain to which plaintiff, noting Matthew and Kyle's ownership of the securities in their portfolio was not 50/50.  IBT statements reflect that Matthew and Kyle were "tenants in common" on the custodial account.  (SAC Ex. 1.)  The SAC need not individually assign allegations to Matthew versus Kyle.

alleged participation in the fraud." DiVittorio, 822 F.2d at 1247.  Because Rule 9(b) requires a

defendant receive fair notice of plaintiff's claim, "a plaintiff alleging a claim sounding in fraud

against multiple defendants under Rule 9(b) must 'plead with particularity by setting forth

*separately* the acts complained of by *each defendant.*'"  Ningbo Prods. Import & Export Co.,

Ltd. v. Eliau, No. 11 Civ. 650, 2011 WL 5142756, at *7 (S.D.N.Y. Oct. 31, 2011) (quoting Sofi

Classic S.A. de C.V. v. Hurowitz, 444 F. Supp. 2d 231, 248 (S.D.N.Y. 2006)); see Sheppard,

2012 WL 1890388, at *5 ("[C]ircumstances amounting to fraud [must] be pleaded as to each

individual defendant, and not premised on guilt by association.").

 According to Cornell, the SAC refers to "Tagliaferri and Cornell," as if they were

a combined unit, no less than 298 times and attributes acts to "Tagliaferri and Cornell," where

related exhibits bear only Tagliaferri's signature.  Cornell urges that the few allegations

specifying acts by her alone cannot support a claim for fraud.  However, the claims allege

Tagliaferri and Cornell omitted and concealed the same information and were acting in concert

to perpetrate the fraud.  For the reasons discussed, the Court concludes the pleadings adequately

distinguish the roles of each participant such that both can ascertain the role he or she played.

2.  Section 10(b) and Rule 10b-5 Violations (Counts III and IV)

 Section 10(b) of the Securities Exchange Act makes it unlawful to "use or

employ, in connection with the purchase or sale of any security . . . any manipulative or

deceptive device or contrivance in contravention of such rules and regulations as the

Commission may prescribe . . . ." 15 U.S.C. § 78j(b).  Rule 10b-5 promulgated thereunder

provides:

> It shall be unlawful for any person, directly or indirectly, by the
> use of any means or instrumentality of interstate commerce, or of
> the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  To state a private action for damages under § 10(b) and Rule 10b–5, "a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Acticon AG v. China N.E. Petroleum Holdings Ltd., 692 F.3d 34, 37 (2d Cir. 2012) (quoting Pac. Inv. Mgmt. Co. LLC v. Mayer Brown LLP, 603 F.3d 144, 151 (2d Cir. 2010)).[16] Count IV alleges omission liability under Rule 10b-5(b); Count III alleges "scheme liability" under Rule 10b-5(a) and (c).  Defendants move to dismiss the claims because the SAC fails to comply with Rule 9(b) and does not adequately allege actionable omissions, scheme liability, scienter, or loss causation.  Tagliaferri again asserts the claims are time-barred.

    a.  Actionable omissions under Section 10(b) and Rule 10b-5(b)

Plaintiffs characterize Count IV as involving "omissions, not misrepresentations." (Pl. Mem. at 18, 21.)  The SAC lists twenty separate "Material Omissions," only some of which pertain to the purported "kickback" scheme. (SAC ¶ 291).  Count IV, however, only alleges that

---

[16] The Court applies the law of the Second Circuit to the federal claims. See Desiano v. Warner-Lambert & Co., 467 F.3d 85, 91 (2d Cir. 2006) ("[E]ven in the transfer context, a court of appeals must develop its own circuit law on federal questions; it cannot mechanically adopt the reasoning and conclusions of its sister circuits.").

failure to inform plaintiffs of the "kickbacks" constitutes an actionable omission.  (Id. ¶ 384.)
The Court considers whether plaintiffs have adequately pled fraud based on the claim that
defendants failed to disclose the "kickbacks" to plaintiffs.

Section "10(b) and Rule 10b–5(b) do not create an affirmative duty to disclose
any and all material information." Kleinman v. Elan Corp., plc, 706 F.3d 145, 152 (2d Cir.
2013) (internal quotation marks and citation omitted).  "Disclosure is required only when
necessary to make statements made, in the light of the circumstances under which they were
made, not misleading." Id. (ellipsis, internal quotation marks, and citation omitted).

Plaintiffs urge that, where a fiduciary duty exists, omission-based fraud may be
pled without the need to identify a particular statement in need of a corrective disclosure.  They
cite Laird v. Integrated Res., Inc., 897 F.2d 826 (5th Cir. 1990), and SEC v. Blavin, 760 F.2d 706
(6th Cir. 1985), for the proposition that "it is beyond dispute" an investment advisor's breach of
fiduciary duty may serve as the basis of a section 10(b) violation.  See also SEC v. Dorozhko,
574 F.3d 42, 49 (2d Cir. 2009) ("[N]ondisclosure in breach of a fiduciary duty 'satisfies §
10(b)'s requirement . . . [of] a "deceptive device or contrivance."'" (second alteration in original)
(citation omitted)).  In Laird, the Fifth Circuit recognized that other circuits, in assessing Rule
10b-5 liability, have concluded that an investment advisor's fiduciary status requires disclosure
of conflicts. 897 F.2d at 833.  The Laird Court concluded that "for the purpose of" Rule 10b-5
"an investment adviser is a fiduciary and therefore has an affirmative duty . . . to avoid
misleading clients . . . includ[ing] disclosure of all material facts and all possible conflicts of
interest." Id. at 835.

Rule 10b-5(b) specifically applies to those who "make any untrue statement of a
material fact or . . . omit to state a material fact necessary in order to make the *statements* made,

in the light of the circumstances under which they were made, not misleading." 17 C.F.R. §
240.10b-5 (emphasis added). The PSLRA tracks the language of subsection (b), requiring the
complaint to "specify each *statement* alleged to have been misleading, [and] the reason or
reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1) (emphasis added). In the
absence of controlling precedent, the Court concludes that the PSLRA, as it applies to a claim
brought under Rule 10b-5(b), requires the pleader to specify a "statement" that is alleged to be
materially misleading because of the information it omits. A claim that the defendant breached
his or her fiduciary duty solely by failing to disclose a fact, which is not related to a statement
that the fiduciary did make, does not suffice under Rule 10b-5(b).[17]

Plaintiffs also allege that actual statements made at meetings and in invoices were
materially misleading because they failed to disclose the "kickbacks." (SAC ¶¶ 382-83.) The
complaint specifies several dates when Matthew met with Tagliaferri to discuss investment
management. (Id. ¶¶ 76, 79.) Cornell was present at four of the meetings. (Id. ¶ 79.) (She
maintains one was a funeral for Kyle's father. (See id. ¶ 86.)) Some took place in New York
and Connecticut, some at Matthew's North Carolina home. (Id. ¶ 77.) Though the background
section of the complaint alleges numerous communications, Count IV identifies no particular
statements made by either Tagliaferri or Cornell. In the face of a motion to dismiss, it is the
plaintiffs' obligation to cull and identify specific statements in its lengthy pleading which
support its fraud by omission claim. Plaintiffs have failed to do so.

For instance, the complaint alleges that at each meeting Tagliaferri stated the

---

[17] Plaintiffs were on notice of this pleading requirement before the filing of the SAC. See 07/24/12 Conf. Tr. at 21
(The Court: "If an omission, you have to give me the statement and then tell me what was omitted from the
statement in order to make it true and what facts you have giving rise to a strong inference of fraud which speaks to
the time the statement was made.").

"money was safe" and Cornell provided assurances that defendants were prudently managing the funds. (Id. ¶ 80.)  Such vague remarks, however, are insufficient to plead a material omission under Rule 10b-5(b).  Cf. ECA, 553 F.3d at 206 ("The statements are too general to cause a reasonable investor to rely upon them.").  Plaintiffs do not explain why disclosure of the "kickbacks" would have rendered not misleading statements such as defendants' assurances that the Szuliks would be able to extract $1 million annually from the portfolio.

The Court, however, views the allegations in the SAC concerning invoices rendered by TAG VI to plaintiffs differently.  At the pleading stage, the invoices are adequately alleged to be statements of the fees charged to plaintiffs, which were materially misleading in failing to disclose other fees that plaintiffs were paying to TAG VI indirectly through IEAH, i.e. the alleged "kickbacks."  The invoice, dated July 1, 2008, is for the period between October 2007 and December 2007.  (SAC Ex. 20.)  Tagliaferri and Cornell "each had ultimate authority over the invoices . . . ."  (Id. ¶ 382; cf. Janus Capital Grp., Inc. v. First Derivative Traders, 131 S. Ct. 2296, 2302 (2011) (person without ultimate authority over content of statement cannot be primary violator who "made" statement); In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 75-76 (2d Cir. 2001) (plaintiffs adequately alleged company vice president's liability for corporation's statements in press release where employee drafted, reviewed, and/or disseminated statements)).[18]  Alternatively, Tagliaferri and Cornell communicated management fee amounts to the Szuliks, who then instructed the custodial agent to pay TAG VI.  (SAC ¶ 382.)

Such communications of the fees were misleading because they did not disclose payments already received in exchange for (1) placing funds with IEAH and (2) later converting

---

[18] Before Janus, the Second Circuit appeared to call into question Scholastic's holding.  See Pac. Inv. Mgmt. Co. LLC, 603 F.3d at 158 n.6. The parties' briefing devotes little attention to these issues, which will be better addressed at the summary judgment stage or at trial.

IEAH debt to equity.  Thus, Tagliaferri and Cornell "collected over $1.4 million in management fees from the Szuliks," without ever explaining they were also "skimming $1.6 million in illegal and undisclosed kickbacks from IEAH."[19]  (Id. ¶ 131.)

    b.  Scienter

The PSLRA  requires that the complaint, "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A).  This calls for "plaintiffs to state with particularity . . . the defendant's intention 'to deceive, manipulate, or defraud.'"  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313 (2007) (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185 194 & n.12 (1976)).  To qualify as "strong," the "inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  Id. at 314.

"The requisite scienter can be established by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness."  ECA, 553 F.3d at 198.  To raise a strong inference of scienter through "motive and opportunity," the complaint must allege defendants benefitted in a concrete and personal way from the fraud.  Id.  A plaintiff may plead scienter with "strong circumstantial evidence" of recklessness that rises to the level where "danger was either known to the defendant or so obvious that the defendant must have been aware of it."  Id.

The facts alleged must address the scienter of each individual defendant.  Scienter is not adequately alleged through group pleading.  In re CRM Holdings, Ltd. Sec. Litig., No. 10

---

[19] The Court notes the SAC elsewhere asserts that defendants failed to reveal the "kickbacks" in TAG VI's Form ADVs.  (SAC ¶ 374.)  The Rule 10b-5(b) claim does not specify any omissions in TAG VI's Form ADVs.

Civ. 975, 2012 WL 1646888, at *30 (S.D.N.Y. May 10, 2012).   Plaintiffs allege in one

paragraph that "Tagliaferri and Cornell" acted with the requisite scienter because they had

discretionary authority over the Szuliks' accounts, knew they were the Szuliks' fiduciaries, and

knew it was fraud to take "kickbacks" in exchange for funding a failing horse operation.  (SAC ¶

339.)

   i. Tagliaferri

    The complaint adequately alleges Tagliaferri acted with scienter.  True, a general

desire to earn management fees is an insufficient motive.  Edison Fund v. Cogent Inv. Strat.

Fund, Ltd., 551 F. Supp. 2d 210, 227 (S.D.N.Y. 2008); cf. Acito v. IMCERA Grp., Inc., 47 F.3d

47, 54 (2d Cir. 1995) ("executive compensation dependent upon stock value does not give rise to

a strong inference of scienter").  But the SAC does not put forth omissions designed merely to

retain or increase management fees.  Rather, nondisclosure benefitted defendants because it

permitted the continuation of undisclosed payments from IEAH.  Beaumont Offset Corp. v.

Montgomery Land and Cattle Co., Inc., 684 F. Supp. 75, 77 (S.D.N.Y. 1988) (Mukasey, J.)

("allegation regarding . . . undisclosed receipt of commissions suggests a motive for . . . failure to

disclose and thus adequately supports an inference of fraud").

    Moreover, the complaint alleges Tagliaferri had opportunities to carry out the

alleged transactions.  Though Tagliaferri asserts that the Iavarone Declaration (Tag. Ex. 7)

"debunked" allegations of "kickbacks," the Court may not consider such extrinsic evidence.

Plaintiffs annex a 2008 Notice of Exercise of Right to Convert signed by Tagliaferri, which

converted an IEAH note to equity and requested $50,000 for TAG VI in consulting fees.  (SAC

Ex. 10.)  The SAC also annexes an e-mail chain between Tagliaferri and Iavarone discussing the

$800,000 two-week loan to IEAH.  In an e-mail dated January 17, 2008 Tagliaferri writes:

> We are prepared to wire $800M as a with a maturity date of
> 1/31/08 (funds must be returned on or before maturity date) in
> return for 25000 shares IEAH Holdings shares. Funds will be
> wired to B. Feiner escrow a/c.  10% or 80M will be withheld for
> TAG VI.  J

(Id. Ex. 13.) Iavarone calls the terms "loan shark" terms that two others would not approve.

Tagliaferri replies, "if the terms are so onerous, they both can have part of the action. You, too."

(Id.) A State Street account statement reflects that $800,000 was wired out on January 17, 2008

and the same amount was received on January 31, 2008. (Id.) Tagliaferri's assertions that the

$800,000 loan was well-documented, repaid in full, and that the note specifically referred to an

advisory fee do not impact the Court's conclusion and/or are based on extrinsic evidence.

        ii.    <u>Cornell</u>

        Cornell presents a closer call.  She disputes having motive, opportunity or

knowledge, asserting the SAC relies upon impermissible group pleading to establish scienter.

Though the SAC does not allege that Cornell directly placed investments with IEAH, the 1996

IMA, which authorized TAG VI to make all investment decisions concerning the portfolio was

signed by Cornell, on behalf of TAG VI.  (Id. Ex. 3.)  TAG VI's 2007 Form ADV lists Cornell

as a person "responsible for investment decisions which effect client portfolios."  (Id. Ex. 2.)

The allegation that Cornell threatened to cut off funding to IEAH bespeaks of discretion over the

funds.  (Id. ¶¶ 167-69.)

        Moreover, numerous allegations indicate Cornell knew of the payments from

IEAH. For instance, on the e-mail chain between Iavarone and Tagliaferri regarding the

$800,000 loan, Iavarone writes "I tried to call Pat and left her a message."  (Id. Ex. 13.)  Cornell

urges the e-mail was not sent or copied to her and merely states Iavarone did *not* speak with her.

The Court considers the reference to Cornell in the context of the e-mail chain.  While the

mention of Cornell, on its own, may not rise to a "strong inference" of scienter, the Court

evaluates "all the allegations holistically." Tellabs, 551 U.S. at 326.

It is alleged that in an attempt to cover up the "kickbacks," Cornell insisted that

IEAH provide her with access to its QuickBooks file and "threatened to cut off funding to IEAH

if she was not given access." (SAC ¶¶ 167-69.) Plaintiffs assert, upon information and belief,

that defendants realized such records would reveal the "kickbacks" during the SEC investigation.

(Id. ¶¶ 170-71.) Cornell correctly points out that the complaint alleges the investigation began

"*in or around* June 2008" while she allegedly insisted on obtaining the files "[at] some point

*prior to* June 2008." (Id. ¶¶ 164, 167 (emphases added).) However, the SAC leaves some

ambiguity in the investigation's start date and the two events were in close temporal proximity.[20]

Finally, the SAC alleges upon information and belief that Tagliaferri and Cornell

"cover[ed] their tracks" by preparing backdated invoices for "consulting services." (Id. ¶¶ 171-

74.) Plaintiffs have pled adequately the facts on which that belief is based: the pending SEC

investigation; copies of the allegedly backdated invoices; and that around the same time IEAH

received the backdated invoices, Tagliaferri and TAG VI's accountant called an IEAH employee

and instructed that IEAH "should change the way it carried the 'kickbacks' on its books." (Id. ¶¶

178-79.) The Court concludes the complaint sufficiently alleges that Cornell acted with scienter.

### c. Statute of Limitations

Chief Judge Dever, considering the initial complaint, concluded that defendants

had "not demonstrated that a reasonably diligent plaintiff would have discovered the alleged

---

[20] Cornell urges such demands only support the inference that she intended to defraud the SEC, not plaintiffs. See ECA, 553 F.3d at 198 ("Moreover, the facts alleged must support an inference of an intent to defraud the plaintiffs rather than some other group."). It is most reasonable to conclude that the allegations support an inference that Cornell intended to defraud both the SEC as well as her own clients. But even if Cornell is correct, the inference that she intended to defraud the SEC indicates she knew of the "kickback" scheme.

section 10(b) and Rule 10b-5 violations more than two years before the Szuliks filed suit."

Szulik, 858 F. Supp. 2d at 539-40.  Tagliaferri again asserts that the federal securities claims are

time-barred.  (Tag. Mem. at 22-25.)  Although the Court has discretion to deviate from the law of

the case doctrine, it declines to do so at this juncture.

The securities fraud claims specifically address the IEAH "kickback" scheme,

while the "storm warnings" cited by Tagliaferri often involve other investments.  Szulik, 858 F.

Supp. 2d at 540 ("Whether the Szuliks knew or should have known about other improper

investments is irrelevant.").  To the extent Tagliaferri relies on allegations in the initial

complaint, Chief Judge Dever has considered them.  Allegations contained in the FAC have been

superseded.  Tagliaferri asserts the custodial account statements attached to the complaint

indicate certain transfers were "paid to no one" (Tag. Mem. at 23), but does not explain the

significance of the documents or their relation to IEAH.  Finally, a statute of limitations defense

based on extrinsic evidence is "of dubious propriety on motion to dismiss."  See Youssef v.

Halcrow, Inc., 11 Civ. 2283, 2011 WL 2693527, at *1 (S.D.N.Y. June 30, 2011).

d.  Loss Causation

As will be discussed, plaintiffs adequately allege loss causation for some portion

of their losses—overpayment of management fees because of the "kickbacks."  But the

complaint does not plausibly allege that all losses due to the IEAH investment were caused by

the failure to disclose "kickbacks."

A securities-fraud plaintiff must allege both transaction causation and loss

causation.  Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 172 (2d Cir. 2005).  Transaction

causation, which is akin to reliance, "requires only an allegation that 'but for the claimed

misrepresentations or omissions, the plaintiff would not have entered into the detrimental

securities transaction.'" Id. (quoting Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc., 343 F.3d 190, 197 (2d Cir. 2003)). Defendants do not contest that transaction causation is adequately pled.

"The loss causation inquiry typically examines how directly the subject of the fraudulent statement caused the loss, and whether the resulting loss was a foreseeable outcome of the fraudulent statement." Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 96 (2d Cir. 2001). "Loss causation 'is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff.'" Lentell, 396 F.3d at 172 (quoting Emergent Capital, 343 F.3d at 197). "[A] misstatement or omission is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations and omissions alleged by a disappointed investor." Id. at 173.

The SAC fails to explain how the nondisclosure or omission of the "kickbacks" diminished the value of the IEAH investments and resulted in a loss.[21] Instead, plaintiffs vaguely assert that defendants caused them to suffer damages by draining their assets and deceiving them into continuing to entrust their savings. (SAC ¶¶ 377, 387.) These allegations more obviously allege transaction causation, i.e. had plaintiffs known of the fraud, they would not have continued to invest with TAG VI.

It is not plainly alleged why the "kickback" scheme forecasted or caused plaintiffs' losses. Undisclosed commissions or payments could, but do not necessarily, conceal the risks associated with an investment. Commissions or payments by a profitable and stable

---

[21] Tagliaferri attributes the losses to the worldwide credit crunch and economic slowdown as well as the fact that in 2011 the Szuliks opposed IEAH's merger with Gerova Financial Corp., a Galanis-related entity. According to Tagliaferri, the merger would have given IEAH access to new investors. The SAC maintains that shortly after the Szuliks threatened to file suit to enjoin the merger, Gerova's stock price plummeted and its stock was delisted. (SAC ¶¶ 332-34.)

enterprise to a financial advisor, if not disclosed, may be a breach of the advisor's fiduciary obligations to the investor-client but they would not necessarily be the cause of an investors' later losses. Here, plaintiffs do not allege how or why nondisclosure of the "kickbacks" "concealed the circumstances that bear upon the loss suffered." Lentell, 396 F.3d at 175.

Plaintiffs assert in their submissions in opposition to the motion that the "kickbacks," if revealed, would have impacted the Szuliks' valuation of their investment, citing Suez, 250 F.3d at 97-98. In Suez, however, an executive's lack of skills and expertise, if revealed, would have forecast the company's eventual liquidity problems and affected plaintiff's valuation of the investment because the "expertise of a skilled executive officer was essential" for that company's viability. Id.

Here, the nexus between the "kickbacks" and plaintiffs' ultimate losses remains attenuated. Plaintiffs' assert that "it can be *reasonably inferred*" that but for the "kickbacks" Tagliaferri and Cornell would not have invested client funds in IEAH. (Pl. Mem. at 29 (emphasis added).) Even if such a theory were sufficient to plead the loss causation element, plaintiffs, on their third attempt at pleading a claim, do not make such an allegation in the SAC. Indeed, plaintiffs' assertion that "*it can be inferred* from the facts alleged in the SAC that, but for the kickbacks, the Szuliks could have obtained a better deal on their IEAH investments" (Pl. Mem. at 29 (emphasis added)) thereby suggests that an honest fiduciary may have placed them in the same investment but on more advantageous terms. (See Pl. Mem. at 29 ("If IEAH was willing to pay kickbacks to TAG VI, it would have also been willing to pay those amounts instead to the Szuliks or . . . offered concomitant discounts on the investments.").) Plaintiffs have failed to adequately allege loss causation. See Dura, 544 U.S. at 347 ("[I]t should not prove burdensome for a plaintiff who has suffered an economic loss to provide a defendant with some

indication of the loss and the causal connection that the plaintiff has in mind.").

  In contrast, plaintiffs have plausibly alleged a loss in being duped into paying full management fees while defendants, unbeknownst to them, were receiving fees from IEAH for the same investment. The fees plaintiffs paid to TAG VI represent an actual loss which is sufficiently connected to the alleged undisclosed "kickback" payments. Accordingly, the Court concludes plaintiffs adequately allege the loss causation element in this regard. However, for the reasons discussed, the Court limits each of the fraud-based claims to those losses resulting from the payment of management fees.

  e. Deceptive scheme under Section 10(b) and Rule 10b-5(a) and (c)

  According to plaintiffs, the undisclosed payments constitute a "scheme" prohibited by Rule 10b-5(a) and (c). (Id. ¶¶ 367-77.) The Court notes while Rule 10b-5(b) expressly requires the pleading of a specific statement, it appears nondisclosure without a specific statement may, under certain circumstances, establish a securities fraud claim under subsection (a) or (c) of the Rule. "Conduct itself can be deceptive." Stoneridge, 552 U.S. at 158 (considering liability under subsections (a) and (c)); cf. SEC v. Zandford, 535 U.S. 813, 820-21 (2002) ("Taking the complaint's allegations as true, each sale was made to further his fraudulent scheme; and each was deceptive because it was neither authorized by, nor disclosed to, the Woods. In the aggregate, the sales are properly viewed *as a course of business that operated as a fraud or deceit* on a stockbroker's customer." (emphasis added)); Chiarella v. United States, 445 U.S. 222, 230 (1980) (considering liability under subsections (a) and (c), and concluding "silence in connection with the purchase or sale of securities may operate as a fraud actionable under § 10(b) despite the absence of statutory language or legislative history specifically addressing the legality of nondisclosure. But such liability is premised upon a duty to disclose

arising from a relationship of trust and confidence between parties to a transaction."); <u>Affiliated</u> <u>Ute Citizens of Utah v. United States</u>, 406 U.S. 128, 153 (1972) (market makers' scheme to induce tribe members to sell shares in corporation set up to manage tribal assets without disclosing material fact that shares traded at higher prices among non-tribe members "disclose[d], within the very language of [subparagraph (a) or (c)], a 'course of business' or a 'device, scheme or artifice' that operated as a fraud").

However, as discussed, plaintiffs have failed to allege that the loss caused by the failure to disclose "kickback" payments by IEAH encompasses any more than what plaintiffs paid in management fees.  Accordingly, plaintiffs' claim under subsections (a) and (c) is duplicative of the subsection (b) claim.  The claim will stand for now, but defendants may renew their application at the summary judgment stage or trial.

3.  Control Person Liability under Section 20(a) (Counts V and VI)

The Szuliks allege control person liability under section 20(a) of the 1934 Act, based on TAG VI's primary violations of Rule 10(b)-5(b) (Count VI) and Rule 10b-5(a) and (c) (Count V).  To establish control person liability, plaintiffs must show "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."  <u>ATSI</u>, 493 F.3d at 108.  "While a party cannot be held liable for both a primary violation and as a control person, alternative theories of liability are permissible at the pleading stage." <u>In re Fannie Mae 2008 Sec. Litig.</u>, 742 F. Supp. 2d 382, 416 (S.D.N.Y. 2010).  Plaintiffs need not need not name the controlled person as a defendant.  <u>See Sgalambo v. McKenzie</u>, 739 F. Supp. 2d 453, 486 n.203 (S.D.N.Y. 2010).

Cornell argues that allegations pertain to Tagliaferri and Cornell individually,

rather than as "corporate representatives" of TAG VI.  TAG VI issued management fee invoices in its name.  Moreover, the kickbacks were allegedly paid to TAG VI accounts.  Plaintiffs have adequately alleged that Cornell and Tagliaferri controlled TAG VI.  Each held a 50% interest. (SAC ¶ 16.)  The firm employed fewer than six people, of which defendants were the only Chartered Financial Analysts.  (Id. ¶ 22.)  The SAC must also allege defendants had control over the particular transactions in question.  TAG VI's 2007 Form ADV describes both Tagliaferri and Cornell as being "responsible for investment decisions which effect client portfolios."  (Id. Ex. 2.)  Numerous documents attached to the SAC indicate Tagliaferri's control over the alleged transactions.  Moreover, it is alleged that Cornell threatened to cut off funding to IEAH if they did not produce their records (id. ¶ 168), indicating control over the flow of funds to IEAH. Finally, for the same reasons the SAC adequately pleads scienter, it sufficiently alleges the culpability element.

4.  North Carolina Investment Advisers Act (Count VII)

Under the North Carolina Investment Advisers Act (the "NCIAA"): "It is unlawful for any person who receives, directly or indirectly, any consideration from another person for advising the other person as to the value of securities or their purchase or sale, whether through the issuance of analyses or reports or otherwise:

> (1) To employ any device, scheme, or artifice to defraud the other
> person, [and]
>
> (2) To engage in any act, practice, or course of business which
> operates or would operate as a fraud or deceit upon the other
> person . . . .

N.C. Gen. Stat. § 78C-8.  Plaintiffs assert Tagliaferri and Cornell violated the NCIAA and are liable for TAG VI's primary violation of the Act.  (SAC ¶¶ 399-400.)  For the reasons discussed,

the Court denies the motions to dismiss Count VII but limits the statutory claim to those losses incurred from the payment of management fees to TAG VI.

The Court rejects Tagliaferri's contention that TAG VI is exempt from the anti-fraud provision of the NCIAA because it was a federally registered investment adviser. On this point the "Definitions" section of the statute is instructive. Although the term "Investment Adviser" does not include investment advisers "covered under federal law," the anti-fraud provision of the NCIAA applies to any "person," a separately defined term. N.C. Gen. Stat. § 78C-2. At the pleadings stage, the Court rejects Tagliaferri's statute of limitations argument without prejudice.

5. Fraudulent Concealment (Count VIII)

Fraudulent concealment "is a form of fraudulent misrepresentation entitling the claimant to damages . . . ." Friedland v. Gales, 509 S.E.2d 793, 797 (N.C. Ct. App. 1998). "To assert a claim for fraudulent concealment, there must be a showing that the opposing party knew a material fact, and failed to fully disclose that fact in violation of a pre-existing duty to disclose." Id. "Where a relation of trust and confidence exists between the parties, there is a duty to disclose all material facts, and failure to do so constitutes fraud." Vail v. Vail, 63 S.E.2d 202, 206 (N.C. 1951) (internal quotation marks and citation omitted). As discussed, plaintiffs have adequately alleged a duty to disclose.

The Court denies the motions to dismiss Count VIII but limits the claim to losses incurred from the payment of management fees because plaintiffs do not otherwise allege that the "kickbacks" proximately caused their losses. Plaintiffs allege Tagliaferri and Cornell fraudulently concealed the payments from IEAH and plaintiffs were harmed as a result. (SAC ¶¶ 404, 407.) Had they not been deceived, plaintiffs would not have allowed their money to be used

for these purposes.  (Id. ¶ 405.)  The complaint does not include factual allegations explaining how plaintiffs' injuries, also ill-defined in the fraudulent concealment claim, were a foreseeable consequence of defendants' concealment of the "kickback" scheme.

6. Negligent Misrepresentation (Count X)

"The tort of negligent misrepresentation occurs when a party justifiably relies to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care." Hudson-Cole Dev. Corp. v. Beemer, 511 S.E.2d 309, 313 (N.C. Ct. App. 1999) (quoting Raritan River Steel Co. v. Cherry, Bekaert & Holland, 367 S.E.2d 609, 612 (N.C. 1988)).  Plaintiffs' discussion of the claim, which is confined to a footnote in the opposition to the motion, does not appear to dispute that "[n]egligent *omissions* . . . as opposed to negligent misrepresentations cannot form the basis of a claim for negligent misrepresentation under North Carolina law." Bonham v. Wolf Creek Academy, 767 F. Supp. 2d 558 (W.D.N.C. 2011) (citing Volumetrics Med. Imaging, Inc. v. ATL Ultrasound, Inc., 243 F. Supp. 2d 386, 413 n.13 (M.D.N.C. 2003)); Breeden v. Richmond Cmty. Coll., 171 F.R.D. 189, 202 (M.D.N.C. 1997)). Rather, plaintiffs' briefing describes Count X as involving misrepresentations.  (Pl. Mem. at 15 n.11; SAC ¶¶ 414-15.)

According to plaintiffs, the negligent misrepresentation claim is *not* fraud-based, and covers both the "kickback" scheme as well as the other improvident investments.  (SAC ¶ 8.) Tagliaferri and Cornell maintain Rule 9(b) applies.  See Ebusinessware, Inc. v. Tech. Servs. Grp. Wealth Mgmt. Solutions, LLC, No. 08 Civ. 9101, 2009 WL 5179535, at *13 (S.D.N.Y. Dec. 29, 2009) (noting the Second Circuit has not decided whether negligent misrepresentation claim must satisfy Rule 9(b), though "a number of district courts in the circuit have required negligent misrepresentation claims to meet Rule 9(b)'s heightened pleading standard").

Count X states generally that information provided during meetings and in account statements was inadequate, incomprehensible, and "failed to provide . . . material facts." Plaintiffs allege Tagliaferri and Cornell "concealed material facts" including the "kickback" arrangement, that management fees were based on inflated asset values, and associations with individuals with past securities violations.  (Id. ¶¶ 415-17.)   A reasonable reading of the claim is that plaintiffs allege omissions or concealment, not misrepresentations.  The scant allegations of misrepresentation in Count X are far too general to state a claim.  The motion to dismiss Count X is granted.

II.  Feiner

A.  State-Law Claims

Plaintiffs bring state-law claims against Feiner for (1) legal malpractice; (2) aiding and abetting breach of fiduciary duty; (3) aiding and abetting fraudulent concealment; and (4) unjust enrichment.  Feiner moves pursuant to Rules 12(b)(6) and 9(b) to dismiss the claims. He also moves to strike certain allegations.

1.  Choice of Law

The parties do not dispute that New York law applies to claims against Feiner. New York choice-of-law principles govern because when the transferor court lacks personal jurisdiction over a defendant, the transferee court's choice-of-law principles govern.  Levy v. Pyramid Co. of Ithaca, 871 F.2d 9, 10 (2d Cir. 1989) (per curiam).  Chief Judge Dever concluded the North Carolina district court lacked personal jurisdiction over Feiner.

Under New York choice-of-law rules, where the issue is defendant's conduct, the law of the state where the conduct occurred usually governs plaintiffs' tort claims.  Babcock v. Jackson, 12 N.Y.2d 473, 483 (1963).  Feiner is licensed to practice law in New York, and is

governed by New York rules concerning legal practice. The two claims for aiding and abetting liability require plaintiffs to establish primary violations on the part of Feiner's co-defendants, which the Court has concluded are governed by North Carolina law. Reserving its right to revisit the issue on a more complete record, the Court applies New York law to the claims against Feiner.

## 2. Legal Malpractice (Count IX)

To assert a claim for legal malpractice a plaintiff must have an attorney-client relationship with the defendant-attorney. In the usual case, that relationship is measured by contractual privity, though Courts have also recognized an attorney-client relationship under circumstances "tantamount to" contractual privity, where plaintiff was a foreseeable third-party beneficiary of the contract. Good Old Days Tavern, Inc. v. Zwirn, 259 A.D.2d 300, 300 (1st Dep't 1999). A plaintiff may establish attorney malpractice absent privity in cases involving "fraud, collusion, malicious acts or other special circumstances." Id.

The Szuliks never met Feiner and entered into no retainer agreement with him. Still, the Szuliks assert the privity requirement is met because TAG VI acted as the Szuliks' agent, and a principal is in privity with his agent's agent. See Herrington v. Verrilli, 151 F. Supp. 2d 449, 463 (S.D.N.Y. 2001) ("[I]t is well settled that a principal is in privity with his agent's agent, or with anyone else his agent deals with on his behalf."); Schneider v. Lazard Freres & Co., 159 A.D.2d 291, 295-96 (1st Dep't 1990).

The complaint alleges several instances where TAG VI, Tagliaferri and Cornell—as agents acting on behalf of their principals, the Szuliks—engaged Feiner to perform legal services for the Szuliks. Feiner allegedly held himself out to others as the Szuliks' counsel in the Paseo note transaction (SAC ¶ 425); at least one Conversion Services stock purchase agreement

(id. ¶ 428); and the PPTI note transactions.  (Id. ¶¶ 204-35, 421; id. Ex. 14 (agreements with

PPTI listing Matthew as the counterparty, with Tagliaferri signing as Matthew's "Agent" ).).

Such transactions are distinct from those where Feiner acted as *TAG VI's* attorney.  (E.g., id. Ex.

6 (IEAH note).)

       The complaint adequately alleges that Feiner acted as a lawyer for the Szuliks and

engaged in legal malpractice.  In blatant conflict of interest, Feiner purportedly represented the

parties with whom the Szuliks were transacting at a time when he held himself out as the

Szuliks' attorney.  (E.g., id. ¶¶ 423-24 (PPTI note), id. ¶¶ 426-27 (Paseo note).)  In connection

with several of the notes, he failed to perfect security interests in underlying collateral.  (E.g., id.

¶ 220 (PPTI note); id. ¶ 256 (Paseo note).)  According to the Szuliks, had they been adequately

represented, they would not hold "essentially worthless" investments or lack recourse against

these companies.  (Id. ¶ 430.)

       Having concluded plaintiffs adequately allege a malpractice claim, the Court need

not address whether plaintiffs' alternative theories of liability (1) that they were foreseeable

third-party beneficiaries or (2) the existence of fraud, collusion, malicious acts or other special

circumstances also state a claim for relief.

3.  Aiding and Abetting Breach of Fiduciary Duty (Count XII)

       To state a claim for aiding and abetting a breach of fiduciary duty, plaintiffs must

allege (1) a breach of fiduciary duty; (2) the participant knowingly induced or participated in the

breach; and (3) damages suffered as a result of the breach.  Kaufman v. Cohen, 307 A.D.2d 113,

125 (1st Dep't 2003).  "Constructive knowledge of the breach of fiduciary duty by another is

legally insufficient to impose aiding and abetting liability."  Id.  A defendant "knowingly"

participates in a breach of fiduciary duty when he provides "substantial assistance."  Sheehy v.

New Century Mortg. Corp., 690 F. Supp. 2d 51, 70 (E.D.N.Y. 2010).  The Court has already concluded the SAC adequately alleges the breach element.

Feiner maintains the complaint does not contain facts alleging that he was aware of the quality of the target investments, plaintiffs' risk tolerance, potential objections plaintiffs' may have to the contents of their portfolio, and what information his co-defendants had disclosed to their clients.  However, it may be reasonably inferred from the detailed factual allegations that Feiner had actual knowledge of the breaches.  For instance, Feiner drafted the note for the $800,000 loan to IEAH.  While the Szuliks received 0% interest on the loan, $80,000 of the $800,000 passed through Feiner's escrow account to TAG VI.  It is alleged that on numerous occasions Feiner drafted amendments increasing the April 2006 PPTI note's principal and extending the maturity of the note—often for no consideration—knowing PPTI had failed to meet its obligations when due.

The SAC is replete with factual allegations that Feiner participated in his co-defendants' breaches of duty by assisting his co-defendants in making unsuitable investments in PPTI, Conversion Services, Paseo, and 1920 Bel Air.  (Id. ¶¶ 434-35.)  Additionally, Feiner allegedly drafted the documents that provided "kickbacks" and other benefits to his co-defendants.  (Id. ¶ 436.)  Accordingly the motion to dismiss Count XII is denied.

4.  Aiding and Abetting Fraudulent Concealment (Count XIII)

A claim for aiding and abetting fraudulent concealment requires plaintiff to show "(1) the existence of an underlying fraud; (2) knowledge of this fraud on the part of the aider and abettor; and (3) substantial assistance by the aider and abettor in achievement of the fraud." Stanfield Offshore Leveraged Assets, Ltd. v. Metro. Life Ins. Co., 64 A.D.3d 472, 476 (1st Dep't 2009) (quoting UniCredito Italiano SPA v. JPMorgan Chase Bank, 288 F. Supp. 2d 485, 502

(S.D.N.Y. 2003)).  Plaintiffs may aver actual knowledge of the fraud generally.  Id.  In order to

"substantially assist" a defendant must (1) affirmatively assist, help conceal, or enable the fraud

to proceed by failing to act, and (2) this action must have proximately caused harm on which the

primarily liability is based.  Id.

   As discussed, plaintiffs have adequately pled the existence of the underlying

claim for fraudulent concealment against Tagliaferri and Cornell.  Feiner takes issue with the

SAC in that it "assumes" (1) plaintiffs were not aware of the kickbacks despite Matthew's

frequent contact with IEAH; (2) Feiner was aware of the kickbacks; and (3) Feiner knew

plaintiffs were not aware of the kickbacks.  For purposes of this motion, however, the Court

accepts the well-pled factual allegations as true.  Finally, the SAC adequately alleges Feiner's

substantial assistance by describing his role in facilitating the "kickbacks."  (SAC ¶¶ 441-42,

444.)  Accordingly, the motion to dismiss Count XIII is denied.

5.  Unjust Enrichment (Count XIV)

   "To prevail on a claim for unjust enrichment in New York, a plaintiff must

establish 1) that the defendant benefitted; 2) at the plaintiff's expense; and 3) that 'equity and

good conscience' require restitution."  Kaye v. Grossman, 202 F.3d 611, 616 (2d Cir. 2000).

According to plaintiffs, Feiner benefitted because he was compensated for the services he

provided.  (SAC ¶ 451.)  Plaintiffs have adequately alleged a claim for unjust enrichment, and

the motion to dismiss Count XIV as to Feiner is denied.

6.  Statute of Limitations

   Feiner asserts to the extent the claims asserted against him involve acts occurring

before November 5, 2007, they are barred by applicable statutes of limitations.  He maintains the

malpractice claim is barred by the statute of limitations, which the parties agree is three years

and accrues the date the malpractice is committed. McCoy v. Feinman, 99 N.Y.2d 295, 301 (2002).

The parties signed a tolling agreement on November 5, 2010. Several instances of malpractice are alleged to have occurred *after* November 7, 2007, e.g. amendments to the 2006 PPTI note. Plaintiffs urge the action is timely as to acts occurring *prior* to November 2007 as well because the "continuous representation doctrine" applies. "[T]here must be clear indicia of an ongoing, continuous, developing, and dependent relationship between the client and the attorney" and "continuing trust and confidence in the relationship between the parties" for the doctrine to apply. Luk Lamellen U. Kupplungbau GmbH v. Lerner, 166 A.D.2d 505, 506-507 (2d Dep't 1990). "[I]ts application is limited to instances in which the attorney's involvement in the case after the alleged malpractice is for the performance of the same or related services and is not merely the continuity of a general professional relationship." Id. at 507. Whether the continuous representation doctrine applies in this case entails factual issues not properly resolved at the motion to dismiss stage.

Feiner's statute of limitations arguments are not fully developed. His arguments do not distinguish between fraud and non-fraud based claims. This is a fact-based affirmative defense, which may be better addressed on a more complete record at the summary judgment stage or at trial.

B. Motion to Strike

Feiner also moves to strike as scandalous and prejudicial portions of the complaint, including his relationships with members of the Galanis family and information regarding a lawsuit he successfully defended. (SAC ¶¶ 56, 58.) Feiner puts forth no case law in support of the motion. Rule 12(f), Fed. R. Civ. P., provides the Court discretion to strike from

the "pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."

A district court "should not tamper with the pleadings unless there is a strong reason for so doing." Lipsky v. Commonwealth United Corp., 551 F.2d 887, 893 (2d Cir. 1976) (citations omitted). As discussed, it is alleged that Feiner introduced Tagliaferri and Cornell to the Galanis family, members of which had a history of illegal and questionable business practices. (SAC ¶¶ 59-60.) Many of the challenged investments in this action involve entities related to the Galanis family. Feiner's awareness of the Galanis family is arguably relevant for assessing the claims. Moreover, while Feiner maintains members of the Galanis family are mentioned in no less than 44 paragraphs of the SAC, he specifies only two such paragraphs in the motion. (Id. ¶¶ 56, 58.) At this juncture, no sufficiently strong reason appears for striking the challenged allegations.

Feiner also takes issue with allegations regarding the filing of other lawsuits asserted against TAG VI and its principals, claiming these references are irrelevant to plaintiff's case. (Id. ¶¶ 319-24.) While mindful of the requirement that evidence must be relevant to plaintiffs' claims, the Court declines to strikes the allegations "on the sterile field of the pleadings alone." Lipsky, 551 F.2d at 893.

III. Denial of Leave to Amend

After the transfer of this action to this District, the parties attended an initial pretrial conference on June 4, 2012. In an Order following the conference, the Court permitted plaintiffs to amend the complaint. Plaintiffs filed an amended complaint on June 15, 2012. The parties attended a subsequent conference on July 24, 2012. The Court again granted plaintiffs

leave to amend the pleading, this time stating "I am granting this one last further leave to amend with the admonitions which I have made on the record today." (07/24/12 Conf. Tr. at 28.)

Plaintiffs have had two opportunities to replead their claims in this forum. Moreover, plaintiffs' memorandum of law in opposition to this motion makes no mention of seeking leave to amend. Accordingly, the Court denies leave to amend the pleading further.

CONCLUSION

Tagliaferri's motion to dismiss is granted as to Counts X and is otherwise denied. Cornell's motion to dismiss (Docket No. 114) is granted as to Count X and is otherwise denied. Feiner's motion to dismiss (Docket No. 120) is denied. Feiner's motion to strike is denied without prejudice. Feiner's motion to stay discovery pending the determination of this motion is denied as moot. Plaintiffs' counsel shall provide Mr. Tagliaferri with copies of all unreported opinions cited herein within fourteen (14) days of this Memorandum and Order.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
August 21, 2013